UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANGEL D. LEBRON, JR.,

                Plaintiff,

    v.

SGT MICHAEL F. MRZYGLOD; C.O.
RYDER S. BADER; C.O. WILLIAM J.
WILLIAMS; C.O. BARRY A. STEVENS;
C.O. RYAN A. KELLY; HEARING
OFFICER B. LEVINE; ALBERT PRACK;
BRIAN FISCHER, Commissioner of NYS
Dept. of NYS DOCS; SUPT. W. LEE, of
Green Haven Facility; CLIFFORD K.
GUNSELT, individually and in their official
capacities,

                Defendants.

No. 14-CV-10290 (KMK)

OPINION & ORDER

---

Appearances:

Angel D. Lebron, Jr.
Woodbourne, NY
*Pro Se Plaintiff*

Neil Shevlin, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Angel D. Lebron, Jr. ("Plaintiff"), an inmate proceeding pro se, brings this Action against

Sergeant Michael Mrzyglod ("Mrzyglod"), Correction Officer ("CO") Barry Stevens

("Stevens"), CO Ryan Kelly ("Kelly"), CO Clifford Gunsett ("Gunsett"), CO Ryder Bader

("Bader"), retired Commissioner's Hearing Officer ("HO") Bruce Levine ("Levine"), and

Superintendent William Lee ("Lee") (collectively, "Defendants"), employees of the New York

State Department of Correction and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his Eighth and Fourteenth Amendment rights when he was assaulted without cause and punished for his alleged misbehavior by being subjected to a procedurally deficient disciplinary hearing.  (*See* First Am. Compl. ("FAC") (Dkt. No. 47); Second Am. Compl. ("SAC") (Dkt. No. 67).)  Before the Court is Defendants' Partial Motion for Summary Judgment.  (*See* Not. of Mot. (Dkt. No. 97).)[1, 2]  For the reasons explained herein, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The Court has described the allegations and procedural history of this case in a prior Opinion.  *See Lebron v. Mrzygold*, No. 14-CV-10290, 2017 WL 365493 (S.D.N.Y. Jan. 24, 2017).  The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motion.

The following facts are taken from Defendants' statements pursuant to Local Civil Rule 56.1, (Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 99)), and Plaintiff's Complaint, FAC, and SAC, and the admissible evidence submitted by the Parties.[3]  Defendants have sent the required Rule 56.2 Notice to Plaintiff.  (*See* Dkt. No. 100.)

---

[1] Defendants move for Summary Judgment as to all claims except for the claims related to the December 26, 2013 first use of force incident in the Green Haven Correctional Facility's ("Green Haven") F&G corridor.  (*See* Not. of Mot.; Defs.' Mem. of Law. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 1 n.1 (Dkt. No. 98).)

[2] Plaintiff also brings suit against William J. Williams, (*see* FAC ¶ 11), but he is only alleged to have been involved in the first use of force incident which is not at issue here.

[3] Although "a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment," *Almonte v. Florio*, No. 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004)

1. The Parties

Plaintiff is currently incarcerated at Otisville Correctional Facility. On December 26, 2013, during the relevant time period, Plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven"). (Defs.' 56.1 ¶ 1.)[4]

On December 26, 2013, Mrzyglod was assigned to work at Green Haven as the East Side Sergeant during the 3:00 p.m. to 11:00 p.m. shift. In this capacity, he was responsible for

(citation and italics omitted), where a plaintiff "verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true to the best of his knowledge," the "verified complaint is to be treated as an affidavit for summary judgment purposes," *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment").

Here, Plaintiff's Complaint, FAC, and SAC each includes a signed and dated verification page stating that Plaintiff declares the contents of those filings to be true under the penalty of perjury. (Compl. 8; FAC 11; SAC 15–16.) Therefore, the Court will accept for purposes of this Motion all admissible facts set forth in Plaintiff's Complaint, FAC, and SAC, that are based on Plaintiff's personal knowledge and about which Plaintiff is competent to testify. *See Colon*, 58 F.3d at 872 ("A verified complaint is to be treated as an affidavit for summary judgment purposes . . . provided that it meets the other requirements for an affidavit under Rule 56(e) . . . requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit . . . ."); *James v. Gage*, No. 15-CV-106, 2019 WL 1429520, at *7 (S.D.N.Y. Mar. 29, 2019) (finding it appropriate to consider pro se plaintiff's first amended complaint as well as opposition papers in deciding a motion to dismiss); *Jenkins v. Chase Bank USA, N.A.*, No. 14-CV-5685, 2015 WL 4988103, at *1 n.1 (E.D.N.Y. Aug. 19, 2015) ("The Court may . . . draw on facts alleged in the [c]omplaint and [a]mended [c]omplaint because even though the [s]econd [a]mended [c]omplaint is the operative pleading, the [c]ourt may still credit admissions in the original complaint and attached exhibits." (citation, alteration, and quotation marks omitted)); *Poindexter v. EMI Record Grp. Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("[E]ven though the [a]mended [c]omplaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits" (citation omitted)); *Johnson v. Doe*, No. 00-CV-3920, 2001 WL 314618, at *1 (S.D.N.Y. Mar. 30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes . . . mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence." (citation omitted)).

[4] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise

supervising approximately 1000 inmates living on the E, F, and G Blocks. (Defs.' 56.1 ¶ 2

(citing Declaration of Michael Mrzyglod ("Mrzyglod Decl.") ¶ 4 (Dkt. No. 101-1)).)

---

statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted). Here, Defendants filed and served their 56.1 Statement, (Defs.' 56.1), in addition to a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 100). Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response (citation omitted)); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and quotation marks omitted)). The Court will therefore consider whether any facts in the record or in Plaintiff's Complaint, FAC, and SAC, contradict Defendants' 56.1 Statements.

On December 26, 2013, the following COs worked during the 3:00 p.m. to 11:00 p.m. shift at Green Haven: Kelly was assigned to work in the Special Housing Unit ("SHU"), (Defs.' 56.1 ¶ 3 (citing Declaration of Ryan Kelly ("Kelly Decl.") ¶ 2 (Dkt. No. 101-2))); Gunsett worked but does not recall his assignment, (id. ¶ 4 (citing Declaration of Clifford Gunsett ("Gunsett Decl.") ¶ 3 (Dkt. No. 101-3))); Bader worked but does not recall his assignment, (id. ¶ 6 (citing Declaration of Ryder Bader ("Bader Decl.") ¶ 2 (Dkt. No. 101-5))); and Stevens was assigned to work as the East Program Escort, (id. ¶ 5 (citing Declaration of Barry Stevens ("Stevens Decl.") ¶ 2 (Dkt. No. 101-4))).

Lee was employed as the Superintendent of Green Haven, from September 3, 2009 to November 16, 2014. (Id. ¶ 7 (citing Declaration of William Lee ("Lee Decl.") ¶ 2 (Dkt. No. 101-6)).)

Levine is currently retired from DOCCS, but he worked as a Hearing Officer from 2010 to 2014. In this capacity, he was responsible primarily for conducting Tier III disciplinary hearings. (Id. ¶ 8 (citing Declaration of Bruce Levine ("Levine Decl.") ¶ 2 (Dkt. No. 101-9)).)

### 2. First Use of Force Incident

On December 26, 2013, Plaintiff was involved in two use of force incidents with staff at Green Haven. The first took place on the F&G Corridor and the second in the SHU. (Defs.' 56.1 ¶ 9 (citing FAC; SAC; Mrzyglod Decl. ¶¶ 5, 8–9; Kelly Decl. ¶¶ 4-5; Gunsett Decl. ¶¶ 6–7; Stevens Decl. ¶¶ 3–4, 8–9).)[5]

As to the first use of force incident, according to Plaintiff, on December 26, 2013, Plaintiff was on his way to a "law-library call-out" with 50 or 60 other inmates. (FAC. ¶ 1.)

_____

[5] Defendants do not move for Summary Judgment as to the first use of force incident, (Not. of Mot.; Defs.' Mem. at 1 n.1), and the Court only briefly describes it here for completeness. Defendants include a very partial record of the facts of the first use of force

After Plaintiff passed through the gate area, a correction officer instructed Plaintiff to sit in the metal detector chair. (*See id.* ¶ 2.) Plaintiff complied, and no contraband was found. (*See id.*) Plaintiff had his legal books in one hand and his identification card in the other. (*Id.*) Plaintiff was then told to approach the wall for a pat-frisk and to remove all objects out of his pockets. (*See id.* ¶ 3.) Plaintiff complied and was then told to place his hands on the wall, spread his legs open, and stretch his body outward until he was on his toes. (*See id.* ¶¶ 4–5.) Plaintiff was patted down, but the correction officer did not find anything. (*See id.* ¶ 6.) After the pat-frisk was completed, the officer swiped Plaintiff's legs from underneath him and Plaintiff fell to the floor. (*See id.* ¶ 7.) While on the floor, Plaintiff began to feel numerous punches and kicks that, he believes, were caused by more than one officer. (*See id.* ¶¶ 8–9.) Plaintiff states that the officers assaulting him were Defendants Bader, Gunsett, Williams, and Stevens. (*See id.* ¶ 11.) Plaintiff specifically notes that Stevens left his assigned area without permission to join in the assault. (*See id.* ¶ 13.) During the assault, Bader and Gunsett held Plaintiff's body down and pulled his head up so that Defendant Mrzyglod, could punch Plaintiff in the eye until Plaintiff could no longer open it. (*See id.* ¶¶ 14–15.) After this incident, Plaintiff states that he was escorted to the SHU by Bader, Stevens, Gunsett, and Mrzyglod. (*See id.* ¶ 16.) The second use of force incident occurred during this transport.

Plaintiff alleges that Mrzyglod planned the initial assault on December 26 in retaliation for an earlier confrontation between Plaintiff and Mrzyglod wherein Plaintiff refused to say "please" when asking for permission to use the restroom. (*See* FAC ¶¶ 30–36.) Plaintiff alleges that after this confrontation, Mrzyglod told Plaintiff that he was going to "get" him. (*See id.*

---

incident in order to discuss the sufficiency of Plaintiff's disciplinary hearing. The Court further discusses the relevant facts regarding the first use of force incident below in *infra* section II.B.2.

¶ 29.)  Plaintiff further alleges that the five officers who assaulted him lied about the incident, falsified the incident report, and testified untruthfully at Plaintiff's disciplinary hearing.  (*See id.* ¶ 40.)

### 3.  Second Use of Force Incident

With respect to the second use of force incident, Plaintiff stated in his deposition that after the first use of force incident, he was "upset and . . . yelling," that he was "raging mad" that the first incident had occurred, and that while he was being transported to the SHU, he asked the officers why they had assaulted him.  (Declaration of Neil Shevlin, Esq. ("Shevlin Decl.") (Dkt. No. 101) Ex. A (April 11, 2018 Deposition Transcript of Angel Lebron ("Pl. Dep.")) at 11, 31 (Dkt. No. 101-18).)  Plaintiff further stated that he "stuck [his] leg out and tried to kick [the officer]."  (*Id.* at 11)  Plaintiff "tried to kick [one officer] in his groin."  (*Id.*)  Plaintiff stated that he did not actually make contact with any of the officers when he swung his leg.  (*Id.* at 32.)  The officers then threw Plaintiff back on the floor facing down "for a couple minutes."  (*Id.* at 11.)  Plaintiff stated that they threw him down "real hard."  (*Id.* at 33.)  Plaintiff stated that Kelly, Gunsett, and Bader were the officers who took him to the ground, and that Stevens may have helped the officers restrain him.  (*Id.* at 32.)  He further stated that the officers did not kick or punch him while he was on the ground, (*id.* at 33), and that he was not injured as a result of being taken down, but had "just a little bump," (*id.*).

Defendants state that COs Gunsett, Kelly, and Stevens used force to take Plaintiff to the ground in the SHU after Plaintiff attempted to, or did, kick CO Stevens in the groin.  (Defs.' 56.1 ¶ 10 (citing Gunsett Decl. ¶¶ 6–7; Kelly Decl. ¶¶ 3–5; Stevens Decl. ¶ 9).)

Kelly states that Plaintiff was in restraints when he and Gunsett brought him up to the SHU at approximately 6:00 p.m., that Plaintiff was "agitated" and "screaming," and that Kelly

and Gunsett attempted to calm him down while they were in the elevator. (Kelly Decl. ¶ 3.)

Kelly further states that when he and Gunsett walked with Plaintiff into the SHU gallery, they

passed Stevens, and Plaintiff kicked Stevens in the groin with his right foot. (*Id*. ¶ 4.) Kelly

states that he and Gunsett took Plaintiff to the ground, and that it was "necessary to use force to

take [P]laintiff to the ground, despite the fact that he was already in restraints, in order to subdue

him and to prevent him from causing further harm to himself or anyone else." (*Id*. ¶¶ 4–5.)

Gunsett states that at approximately 5:45 p.m. Mrzyglod directed him and Stevens to

assist with escorting Plaintiff to the SHU. Plaintiff was in restraints after having just been

involved in a use of force incident. (Gunsett Decl. ¶ 4.) Gunsett states that he, Stevens, and

Mrzyglod escorted Plaintiff to the SHU, and that while they were in the elevator, Plaintiff "was

resistant, thrashing around, pushing back against me, spitting, and making threats." (*Id*. ¶ 5.)

Once they got to the SHU floor, Stevens exited the elevator to coordinate with SHU staff, but

Gunsett did not as he continued to maintain control of Plaintiff. (*Id*. ¶ 6.) Then, Gunsett along

with SHU staff walked out of the elevator into the SHU area, where they passed Stevens.

According to Gunsett, Plaintiff walked over to Stevens and kicked him in the groin. In response,

Kelly and Gunsett took Plaintiff to the ground in order to subdue him. (*Id*.)

Stevens states that at approximately 5:45 p.m., Mrzyglod directed him and Gunsett to

escort Plaintiff to the SHU. On his way to the elevator, Plaintiff was in restraints but continued

to resist, spit at the officers, and scream that he was going to kill everyone. (Stevens Decl. ¶¶ 5–

6.) Stevens states that he got off the elevator first, allowed SHU staff to assist Gunsett in

handling Plaintiff, and then waited for Plaintiff to be taken off the elevator. (*Id*. ¶¶ 7–8.)

Stevens further states that once Plaintiff was removed from the elevator, he walked past him and

kicked him in the groin with his right foot. (*Id.* ¶ 8.) Officers then took Plaintiff to the ground and Stevens "fell on top of Plaintiff and attempted to get him in a figure-four-leg lock." (*Id.* ¶ 9.)

Mrzyglod states that on the elevator on the way to the SHU, Plaintiff was "screaming, threatening to kill staff, and pushing back against CO Gunsett." (Mrzyglod ¶ 7.) Upon reaching the floor, Mrzyglod and Stevens exited the elevator and stopped a few feet from the entrance while SHU staff tried to help Gunsett calm Plaintiff down. (*Id.* ¶ 8.) Then Kelly, Gunsett, and other SHU staff escorted Plaintiff off the elevator. As Plaintiff passed Stevens, he kicked him in the groin with his right foot. (*Id.*) Mrzyglod states that next, Gunsett and Kelly took Plaintiff to the ground face first, and Stevens applied a figure-four leg lock to Plaintiff's legs in order to control Plaintiff. (*Id.* ¶ 9.)

Once control of Plaintiff had been achieved, he was stood up and placed on the wall. (Mrzyglod Decl. ¶¶ 8–10; Kelly Decl. ¶¶ 4–6; Gunsett Decl. ¶¶ 6–7; Stevens Decl. ¶¶ 8–9.) Mrzyglod, Gunsett, Kelly, and Stevens were then relieved by responding staff and directed to go to the medical clinic to be evaluated. (Mrzyglod Decl. ¶ 11; Kelly Decl. ¶ 6; Gunsett Decl. ¶ 7; Stevens Decl. ¶ 9.)

Defendants have submitted a video of the second use of force incident in the SHU. (Shevlin Decl. Ex. B (Video of December 26, 2013 Use of Force Incident in the Special Housing Unit ("Video").) Plaintiff stated in his deposition that he saw the video. (Pl. Dep. 32.) It is not clear from the video whether Plaintiff actually kicked Stevens in the groin or just attempted to. In the video, Plaintiff moves abruptly towards one of the COs, the CO jumps back away from Plaintiff, the other COs are seen leaping on top of Plaintiff to constrain him, and the COs are seen eventually standing Plaintiff up.

### 4. Plaintiff's Medical Treatment

After the use of force incidents, Plaintiff was processed for his entry into the SHU and was seen by two nurses, but was not given any medication. (*See* FAC ¶ 19.) Plaintiff was put in a cell without any medical attention for several hours before being taken to the medical department. (*See id*. ¶ 20.) There, he was seen by a nurse, but he did not receive any medication or treatment again. (*See id*.) Plaintiff was eventually put on a tele-med interview with a doctor from Erie County Medical Center and was taken to Putnam Hospital Center to have his injuries evaluated. (*See id.* ¶ 21.)

Plaintiff states that as a result of the use of force incidents, he continues to suffer paranoia, depression, low self-esteem, emotional distress, headaches, problems with his eyes, and is always in fear he will be attacked again. (SAC at 12.)

### 5. The Disciplinary Hearing

#### a. DOCCS Rules for Disciplinary Hearings

If an inmate commits a rule violation that involves a danger to "life, health, security, or property[,] [it] must be reported [by the witnessing staff member], in writing, as soon as practicable." (Defs.' 56.1 ¶ 13 (citing Levin Decl. ¶ 5; Ex. A (DOCCS Directive 4932, Chapter V, Standards Behavior & Allowance ("Dir. 4932") § 251-3.l (a) (Dkt. No. 101-10))).) This Inmate Misbehavior Report, often referred to as a "ticket," must include a descriptions of the alleged incident, reference the specific rule violated, and the date, time, and place of the incident. (*Id.* (citing Levin Decl. ¶ 5; Dir. 4932 §§ 251-3.l (b)–(c)).) A review officer is charged with reviewing all tickets at least once per day and then referring tickets to the appropriate disciplinary body. (*Id*. ¶ 14 (citing Levin Decl. ¶ 6; Dir. 4932 §§ 251-2.2 (a)–(b)).)

DOCCS has three tiers for categorizing tickets. (*Id.* ¶ 15 (citing Levin Decl. ¶ 7).) An inmate is sent for a Violation Hearing, referred to as a Tier I offense, when the alleged violations might result in penalty of loss of recreation and privileges for up to 13 days. (*Id.* ¶ 16 (citing Levin Decl. ¶ 7; Dir. 4932 § 251-2.2 (b)).) An inmate is sent for a Disciplinary Hearing, referred to as a Tier II offense, when the alleged violations might result in a penalty of loss of privileges, including confinement to a cell or room or keep lock, for a period of up to 30 days. (*Id.* ¶ 17 (citing Levin Decl. ¶ 7; Dir. 4932 § 251-2.2 (b)).)

An inmate is sent for a Superintendent's Hearing, referred to as a Tier III offense, when the alleged violations might result in a penalty in excess of 30 days. In such a case, the ticket is forwarded to the Superintendent for designation of a hearing officer. (*Id.* ¶ 18 (citing Levin Decl. ¶ 7; Dir. 4932 § 251-2.2 (b)).) A Superintendent's Hearing "shall be conducted by . . . [t]he Superintendent, a Deputy Superintendent, a Captain, a Commissioner's Hearing Officer ('HO') employed by DOCCS, or any other employee designated by the Superintendent in his discretion." (*Id.* ¶ 19 (citing Levin Decl. ¶ 9; Dir. 4932 § 254.1).)

The formal charge against the inmate "shall consist of the misbehavior report." (*Id.* ¶ 20 (citing Levin Decl. ¶ 10; Dir. 4932 § 254.3).) "An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate . . . ." (*Id.* ¶ 21 (citing Levin Decl. ¶ 11; Dir. 4932 §§ 251-4.1–4.2, 254.4).) The assistance provided to the inmate includes, among other tasks, compiling documents requested by the inmate to be used as evidence and arranging for other inmates or staff to testify at the hearing as witnesses. (*Id.*)

The inmate "shall be present at the hearing unless he or she refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing must be electronically recorded." (Defs.' 56.1 ¶ 22 (citing Levin Decl. ¶ 12; Dir. 4932 § 254.6 (a)(2)).)

In addition, the inmate "when present, may reply orally to the charge and/or evidence and shall be allowed to submit relevant documentary evidence or written statements on his or her behalf." (*Id.* (citing Levin Decl. ¶ 12; Dir. 4932 § 254.6 (a)(3)).)

The "inmate may call witnesses on his or her behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented." (*Id.* ¶ 23 (citing Levin Decl. ¶ 13; Dir. 4932 § 254.5).)

Levine states that although an inmate is permitted to call witnesses for his defense, the questioning of those witnesses is done by the HO in order to allow the HO to maintain control of the hearing and to prevent the inmate from leading or badgering the witness. (*Id.* ¶ 24 (citing Levin Decl. ¶ 14).) The inmate poses the question to the HO who then poses the question to the witness. This procedure is not codified in any DOCCS Directive, but is included in the training provided to hearing officers conducting Tier III hearings. (*Id.*)

If the HO determines that the inmate is guilty of one or more of the violations alleged in the ticket, the HO may impose a number of different penalties, including: (i) counseling the inmate; (ii) loss of one or more privileges for a specified period; and (iii) "confinement to a cell or room continuously or to a special housing unit continuously." (Defs.' 56.1 ¶ 25 (citing Levin Decl. ¶ 15; Dir. 4932 §§ 254.7 (a)(1)(i)–(iii)).)

The HO "may suspend imposition of any penalty for a period of up to 180 days. Any such suspended penalty may be imposed by a subsequent disciplinary hearing or Superintendent's hearing officer upon substantiating a new charge of misbehavior or in a subsequent hearing within a specific period." (*Id.* ¶ 26 (citing Levin Decl. ¶ 15; Dir. 4932 §§ 254.7 (a)(4)).)

Within "24 hours after the conclusion of the hearing, the inmate shall be given a written statement of the disposition of the hearing. This statement shall set forth the evidence relied upon by the hearing officer in reaching his or her decision and also set forth the reasons for any penalties imposed . . . ." (*Id.* ¶ 27 (citing Levin Decl. ¶ 17; Dir. 4932 §§ 254.7 (a)(5)).)

### b.  Plaintiff's Disciplinary Hearing

Plaintiff states that Levine, the Hearing Officer at his disciplinary hearing, failed to fully investigate the first use of force incident and denied Plaintiff's requests to call various witnesses. (FAC ¶¶ 46–47.)  Plaintiff posits that had Levine conducted a thorough investigation, the outcome of his hearing may have been different. (*See id.* ¶ 51.)

On December 28, 2013, CO Rodriguez delivered to Plaintiff two Tier III Inmate Misbehavior Reports or tickets, one for each of the two use of force incidents from December 26, 2013. (Defs.' 56.1 ¶ 28 (citing Levin Decl. ¶ 18, Ex. B (Misbehavior Reports ("Tickets")), Ex. C (Superintendent Hearing Disposition Rendered Form ("Hearing Form"))).)

The first ticket was issued by Bader and accused Plaintiff of possessing a weapon, specifically a razor blade, attempting to discard that weapon, and then acting aggressively toward officers and violently resisting their efforts to subdue him. That ticket charged Plaintiff with the following rule violations: Violent Conduct (104.11), Direct Order (106.10), Interference

(107.10), Possession of a Weapon (113.10), Search and Frisk Procedures (115.10), and Smuggling (114.10). (Defs.' 56.1 ¶ 29 (citing Levin Decl. ¶ 17; Tickets at Lebron 22).)

The second ticket was issued by Stevens and accused Plaintiff of threatening staff members and kicking Stevens in the groin. The second ticket charged Plaintiff with the following rules violations: Staff Assault (11.11), Threats (102.10), and Violent Conduct (104.11). (*Id*. ¶ 30 (citing Levin Decl. ¶ 18; Tickets at Lebron 23).)

Levine was assigned to conduct the Tier III Hearing for both tickets. (*Id*. ¶ 31 (citing Levin Decl. ¶ 19; Ex. D (Inter-Departmental Communication) at Lebron 142).) Plaintiff subsequently selected Offender Rehabilitation Coordinator H. Saldana as his Assistant. (*Id*. ¶ 32 (citing Levin Decl. ¶ 19, Ex. E (Notice of Assistance Form) at Lebron 202).)

The hearing was conducted over the course of several days between January 10, 2014 and March 5, 2014. (*Id*. ¶ 33 (citing Levin Decl. ¶ 25).)

Plaintiff requested that ten inmates be called to testify. (*Id*. ¶ 34 (citing Levin Decl. ¶ 21; Ex. F (Inmate Witness Forms and Memoranda ("Witness Forms")) at Lebron 147–56, 210).) Of these ten inmates, only three, Green, Joyner, and McNeely, agreed to testify. The remaining seven—Angel Maldonado, Miguel Rivera, Michael Cordero, Richie Molina, Allah Asiatic, McNeel Kief, and Roy King—refused to testify or were unavailable to testify. (*Id*. ¶ 35 (citing Levin Decl. ¶ 21; Witness Forms at Lebron 147–56, 210).) A hearing officer has no means of forcing an inmate to testify or of interrogating him outside of the context of the hearing. (*Id*. ¶ 36 (citing Levin Decl. ¶ 22).)

Plaintiff requested that ten inmates be called to testify. (*Id*. ¶ 37 (citing Levin Decl. ¶ 24; Hearing Form at Lebron 124–25).) Levine denied Plaintiff's request to call several additional staff members as witnesses because they were not present for the use of force

incidents, did not have relevant information, or were redundant.  (*Id.* ¶ 38 (citing Levin Decl. ¶ 24).)

Levine denied Plaintiff's request to call the following staff members as witnesses: (i) the officers who escorted Plaintiff to Downstate Correctional Facility after the incidents, as not relevant; (ii) all of the officers in the medical clinic, as redundant and not relevant; (iii) Sergeant Serber, who Plaintiff asked for as a character witness; (iv) additional officers who responded to the SHU on December 26, 2013, as not relevant and/or duplicative; (v) Assistant Saldana, who assisted Plaintiff in preparing for his disciplinary hearing, as Saldana was not a fact witness; (vi) Nurse Barret, who was not a fact witness; and (vii) Superintendent Lee, as he was not a fact witness.  (*Id.* ¶ 39 (citing Levin Decl. ¶ 24; Hearing Form at Lebron 125; Levine Decl. Ex. G (Witness Interview Notice Forms) at Lebron 143–45; Levine Decl. Ex. H (Transcript of Disciplinary Hearing ("Hr. Tr.") at Lebron 595–96)).)  Plaintiff signed the Witness Interview Notice Forms, which lists the reasons for which specific witness requests were denied.  (*Id.*)[6]

During the disciplinary hearing, testimony was elicited regarding the item or weapon Plaintiff was allegedly observed discarding prior to the first use of force incident, including where the item was found, what kind of item it was, and that proper documentation was made of how, where and by whom the item was secured and photographed.  (*Id.* ¶ 44 (citing Levin Decl.

---

[6] Plaintiff refused to sign portions of the Hearing Form listing the requested witnesses and the witnesses who testified.  (Hearing Form at Lebron 124–25.)  Those portions of the form state that "[i]f any witness is denied or if a requested witness testified outside the presence of the inmate . . . and/or the inmate is not permitted to review testimony of such witness, form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record.  (*Id.*)  The Witness Interview Notice Forms that Plaintiff did sign are Form 2176, and those forms list the reasons for which the witness requests were denied.  (Witness Interview Notice Forms at Lebron 143–45.)

¶ 28; Hr. Tr. at Lebron 398–04 (Testimony of CO Bader), 559 (Testimony of CO William J. Williams), 691–94 (Testimony of Captain Melville).)

Defendants state that Plaintiff has not provided any examples of questions he asked HO Levine to pose to witnesses that Levine refused to ask.  (Defs.' 56.1 ¶ 4 (citing Pl. Dep. 64).) This statement is inaccurate—Plaintiff stated during his deposition that Levine "never questioned how I smuggled a weapon or anything else, where did they see me pull it from?  He never said nothing.  He never questioned the officers.  And I asked him that in the hearing.  Like how did I strike them or whatever the case may be?"  (Pl. Dep. 63.)  Plaintiff stated that he had his identification card in his hand during the search and questioned how it was possible he smuggled anything else.  (*Id*.)

With respect to the first use of force incident and the first ticket that was issued Plaintiff, the COs claimed they saw Plaintiff discard an object that turned out to be a razor blade when they asked him to come sit on the metal detector chair.  (Ticket at Lebron 22.)

Captain Melville testified about the process by which the razor was moved from the "drop box to the contraband room," and why there was a delay from December 26 to December 31, 2013 in moving the razor.  (Hr. Tr. at Lebron 691–94.)  At the end of the short selection of hearing transcript that Defendants submitted, Plaintiff stated that he wanted to ask Melville a question, specifically how many Captains were assigned to the facility.  Levine stated, "we've already gone through that," (*id*. at 694), however, Defendants did not submit the portion of the hearing transcript in which Plaintiff's potentially relevant question about the Captains and their role in transferring contraband was asked or answered.

Defendants include a single page of Williams's testimony in which he stated that the garbage cans where the razor was found were not close enough for Plaintiff to reach, and that the

discarded item or weapon he observed "was like a two inch razor blade like a weapon with a . . . masking tape handle and it had a . . . cardboard sheet that was wrapped in . . . masking tape," and was not covered in plastic. (Hr. Tr. at Lebron 559.) Defendants did not include any testimony from Williams regarding where Plaintiff pulled the razor from or how he smuggled it in.

Bader testified that during "a yard run through F and G," he "presume[s]" that "inmate Lebron walk[ed] and . . . ditched, like, some sort of little object over by the garbage and then when they called him, he turned toward Officer Williams, and . . . had his fists up." (Hr. Tr. at Lebron 398.) Bader testified that at that time he tackled and tried to restrain Plaintiff. (*Id.* at 399.) Bader testified that he "just saw [Plaintiff] throw something to the garbage cans" but "didn't see his hands before that . . . [he] just saw something leave his hand." (*Id.* at 401.) During Bader's testimony, Plaintiff instructed Levine to ask Bader whether he saw Plaintiff take the weapon out of his pocket, mouth, pants, or whether he had it in his hand. (*Id.* at 403.) Levine asked Bader this question, and Bader replied that he did not see where the weapon came from. (*Id.*)

According to Levin, a hearing officer is not required to ask every question posed to a witness by an inmate, rather only the relevant ones. (Defs.' 56.1 ¶ 45 (citing Levin Decl. ¶ 29).) A hearing officer is also not required to frame questions in the way requested by the inmate, but instead is often required to reframe questions to elicit testimony that addresses the issues raised and to ensure the testimony will be clear. (*Id.*) Hearings officers can also independently ask relevant and appropriate questions to elicit facts and to ensure the factual record is clear. (*Id.*)

At the conclusion of the hearing, Levine found Plaintiff guilty of all of the charges against him. (*Id.* ¶ 40 (citing Levin Decl. ¶ 25; Hearing Form at 123–28; Hr. Tr. at Lebron 800–05).) The decision was based on the "substantial evidence" before Levine, including the two

tickets, the testimony of the witnesses, Plaintiff's testimony, photographs, video, and Plaintiff's medical records.  (Defs.' 56.1 ¶ 41 (citing Levin Decl. ¶ 25; Hearing Form at 128).)  Levine credited the account set forth in the two tickets as corroborated by the testimony of Bader and Stevens who issued the tickets.  (*Id*.)  Levine sentenced Plaintiff to fourteen months in the SHU and fourteen months of loss of packages, commissary, phones, and good time.  (*Id*. ¶ 42 (citing Levin Decl. ¶ 26; Hearing Form at 123).)

A hearing officer who is conducting a hearing regarding tickets an inmate has received is not permitted to investigate the circumstances surrounding the issuance of those tickets.  (*Id*. ¶ 43 (citing Levin Decl. ¶ 27; Dir. 4932 § 254.1).)  If Levine had conducted his own investigation into the issuance of the two tickets, he would have been barred from conducting the disciplinary hearing.  (Levine Decl. ¶ 27.)

### 6.  Plaintiff's Grievance to Defendant Lee

Plaintiff states that two weeks prior to the use of force incidents, he sent Lee a grievance expressing fear that he would be assaulted because of the threat Mrzyglod made against him.  (FAC ¶ 53.)  Plaintiff states that Lee ignored this grievance, failed to perform his duties, failed to protect Plaintiff, and failed to follow the "rules and procedures of this situation."  (SAC at 2.)  Plaintiff states that Lee failed to investigate the assault on him involving a weapon that the "officers planted at the scene of events."  (*Id*.)  Plaintiff further states that on the day of the use of force incident, the COs did not make any distress calls or indicate that any staff was experiencing a "threat or serious problem," that this was unusual, and that Lee should have found this suspicious and further investigated.  (*Id*.)  Plaintiff further states that Lee failed to conduct background investigations of the COs and that such an investigation would have revealed they

were involved in many incidents of physical violence. (*Id.* at 3, 5.) Plaintiff does not, however, name specific COs or offer any factual allegations about their previous instances of violence.[7]

### a. Grievance No. GH-76369-14

Lee states that on January 2, 2014, he received a copy of Inmate Grievance No. GH-76369-14, which Plaintiff had filed that same day, alleging that on December 21, 2013, Mrzyglod had threatened to assault him. (Defs.' 56.1 ¶ 47 (citing Lee Decl. ¶ 6, Ex. A at Lebron 988 (Initial Superintendent Review of Grievance No. GH-76369-14)).)

The Court notes that although the January 2, 2014 date appears in Lee's Declaration, (Lee Decl. ¶ 6), the Initial Superintendent Review of Grievance No. GH-76369-14, (Initial Superintendent Review of Grievance No. GH-76369-14), and the Acknowledgement of Receipt Form, (Lee Decl. Ex. A at Lebron 989), the date on Plaintiff's grievance letter itself is December 21, 2013, and describes the events in question as having taken place on that date, (Lee Decl. Ex. A at Lebron 990 ("Dec. 21 Grievance Letter")). On the first page of the letter, there is a notation in the top right corner stating "1/2/14," but it is not clear to the Court that this is Plaintiff's writing as there are what appear to be "FM" initials next to the 1/2/14 date, and there are also other illegible notations that could be official notations. (*See* Dec. 21 Grievance Letter.) Moreover, Plaintiff alleges that he submitted his grievance regarding Mrzyglod two weeks before the use of force incidents. (FAC ¶ 53.)

Plaintiff's Grievance No. GH-76369-14 was ultimately denied on August 27, 2014, based on a written statement by Mrzyglod denying that he threatened Plaintiff, and the written

---

[7] Plaintiff also argues that Defendants Fischer and Prack should not have been dismissed from this case, but fails to offer any new factual allegations against either, other than to allege in broad terms that they failed to perform their duties and had knowledge of an alleged set-up against Plaintiff. (*See* SAC at 8–10.)

statements of other officers Plaintiff named in his grievance stating that they did not witness the incident.  (Lee Ex. A. at Lebron 1002 ("Grievance No. GH-76369-14 Appeal").)  Plaintiff appealed the denial of his grievance on September 15, 2014.  (*Id.*)

Defendants did not include any further documents about what ultimately happened to Grievance No. GH-76369-14 on appeal.  It is unclear why there was a nine-month delay in resolving Grievance No. GH-76369-14.

### b.  Grievance No. GH-76475-14

On January 21, 2014, Plaintiff filed Grievance No. GH-76475-14, alleging that he was assaulted on December 26, 2013.  (Defs.' 56.1 ¶ 48 (citing Lee Decl. ¶ 8, Ex. B at Lebron 45-120 (Grievance No. GH-76475-14).)  In response, on January 16, 2014, Lee assigned facility staff to investigate the allegations in the Grievance.  (*Id.* (citing Lee Decl. Ex. B at Lebron 50).)[8] Defendants' documents regarding Grievance No. GH-76475-14 have conflicting dates.  Most of the documents state that Grievance No. GH-76475-14 was filed on January 21, 2014, (Lee Decl. Ex. B. at Lebron 47–48), but the Initial Supervisor Review of Grievance form which Lee filled out to initiate the investigation is dated January 15, 2014, (Lee Decl. Ex. B. at Lebron 50).

On or about February 27, 2014, Lee issued a decision noting that while he had assigned a captain to investigate the allegations in Grievance No. GH-76475-14, there was an ongoing investigation by the Inspector General ("IG").  As a result, any necessary action would be stayed pending the resolution of the IG investigation.  (Defs.' 56.1 ¶ 49 (citing Lee Decl. ¶ 9, Ex. B at Lebron 57).)

---

[8] Defendants state that Lee initiated an investigation on *January 16*, 2014, in response to a grievance that was filed on *January 21*, 2014, but do not explain how that is possible.  This assertion only adds confusion to Defendants' already unclear description of when Plaintiff filed his various grievances.

On March 4, 2014, Plaintiff appealed Lee's decision regarding Grievance No. GH-76475-14 to the Central Office Review Committee ("CORC").  (*Id.* ¶ 50 (citing Lee Decl. ¶ 9, Ex. B at Lebron 57).)  On September 17, 2014, CORC denied Plaintiff's grievance, noting that the IG had found Plaintiff's claims to be unsubstantiated.  (*Id.* ¶ 51 (citing Lee Decl. ¶ 9, Ex. B at Lebron 45).)

B.  Procedural Background

Plaintiff filed his initial Complaint on December 31, 2014.  (*See* Compl. (Dkt. No. 1).)  In a letter dated December 12, 2014, received by the Court on December 31, 2014, Plaintiff applied for the Court to appoint him counsel.  (Dkt. No. 4.)  On April 24, 2015, Plaintiff submitted a supplementary letter in support of his request for appointment of counsel.  (*See* Dkt. No. 10.) The Court denied Plaintiff's first request for counsel without prejudice on June 16, 2015.  (Dkt. No. 20.)

On December 2, 2015, Plaintiff was granted leave to file an amended complaint, (Dkt. No. 46), and Plaintiff filed his FAC on January 15, 2016, (*see* Dkt. No. 47).  On February 25, 2016, Defendants Bader, Gunselt, Kelly, Levine, Mrzyglod, Stevens, and Williams filed their Answer.  (*See* Dkt. No. 50.)  On February 26, 2016, Defendants Lee, Prack, and Fischer were granted leave to file a motion to dismiss.  (*See* Dkt. No. 53.)

On January 24, 2017, the Court issued an Opinion and Order dismissing Fischer and Prack from the case, for lack of personal involvement and on qualified immunity grounds respectively.  (January 24, 2017 Opinion & Order ("January 2017 Opinion") 22, 24 (Dkt. No. 63).)  The Court dismissed Plaintiff's claim against Lee for failing to adequately review Plaintiff's disciplinary hearing record, but did not dismiss the claim against Lee for his alleged

21

failure to adequately respond to Plaintiff's grievance filed two weeks before the assault. (*Id*. at 14–15.)

On March 15, 2017, Plaintiff filed his SAC. (Dkt. No. 67.) On April 5, 2017, Defendant Lee filed his Answer. (Dkt. No. 70.) On January 3, 2018, the case was referred to a Magistrate Judge for general discovery purposes. (Dkt. No. 75.)

On January 17, 2018, Plaintiff again applied for the Court to request counsel. (Dkt. No. 80.) The Court denied his request without prejudice on March 30, 2018. (Dkt. No. 87.)

Discovery was completed on June 11, 2018. (Dkt. No. 94.) On July 12, 2018, the Court held a pre-motion conference, (Dkt. (minute entry for Jul. 12, 2018)), and adopted a Motion Scheduling Order, (Dkt. No. 96).

On September 13, 2018, Defendants filed their Partial Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement. (Not. of Mot.; Defs.' Mem. of Law. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 98); Defs.' 56.1; Shevlin Decl.) That same day, Defendants sent a Rule 56.2 Notice to Plaintiff. (Dkt. No. 100.)

On September 24, 2018, and October 1, 2018, Plaintiff requested extensions to file his reply to the Motion. (Dkt. Nos. 103–104.) On November 8, 2018, Plaintiff requested that the Court reopen discovery. (Dkt. No. 105.) On November 13, 2018, the Court denied Plaintiff's request, stating that discovery had been closed and that Plaintiff had until December 13, 2018 to respond to the Motion. (Dkt. No. 106.)

On November 29, 2018, Plaintiff again requested that the Court appoint him counsel. (Dkt. No. 107.) On December 11, 2018, Defendants requested an extension for Plaintiff to reply to the Motion until February 5, 2019 because he had been moved to a different correctional

facility. (Dkt. No. 108.) The Court granted Defendants' extension request but stated that this would be the last extension. (Dkt. No. 109.)

On December 29, 2018, the Court granted Plaintiff's request for counsel, (Dkt. No. 110), and on April 22, 2019, informed Plaintiff that the Court was still attempting to find counsel for him, (Dkt. No. 112).

Plaintiff was not granted any further extensions to file his response to the Motion and Plaintiff has to date not filed such a response. The Court therefore considers the Motion fully submitted.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr*

*Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation marks omitted).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage."  *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (quotation marks omitted).  Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court.").  "Although [Plaintiff's] evidence may be thin, [Plaintiff's] own sworn statement is adequate to counter summary judgment."  *Scott*

*v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

Defendants argue that Plaintiff was not subjected to excessive force during the second use of force incident, (Defs.' Mem. at 9–11), that Plaintiff's due process rights were not violated during his disciplinary hearing, (*id*. at 11–16), that Plaintiff's claims against Lee fail because he

was not personally involved in any constitutional violation, (*id.* at 17–19), and that Defendants

are entitled to qualified immunity, (*id.* at 21–23).[9, 10]  The Court addresses each argument in turn.

---

[9] Defendants correctly point out that the Eleventh Amendment bars all damage claims against Defendants in their official capacity. (Defs.' Mem. 21.)  Inasmuch as Plaintiff brings his claims against the Defendants in their official capacity, the Second Circuit has held that "[t]o the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). Accordingly, suits against state officials in their official capacity seeking damages are routinely dismissed on immunity grounds. *See, e.g., Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (holding that Eleventh Amendment barred claims against prison superintendent in his official capacity); *Jackson v. Bederman*, No. 12-CV-1338, 2014 WL 2805242, at *13 (S.D.N.Y. June 20, 2014) (holding that the Eleventh Amendment barred claims against DOCCS officials in their official capacity).  To the extent Plaintiff sues Defendants in their official capacities, his claims fail.  Plaintiff may only sue Defendants in their individual capacities.

[10] Defendants also argue that they were not deliberately indifferent to Plaintiff's medical needs. (Defs.' Mem 19.)  Although Plaintiff states that after the second use of force incident he was taken to a cell and not provided with any medication, and that it was hours before he was taken to receive treatment, (*see* FAC ¶¶ 19–23; Compl. ¶¶ 8–9, 14–15, 28), Plaintiff does not name the medical professionals who treated him or the officers who transported him to the medical department as parties in this case, and Plaintiff does not allege the involvement of any of the named Defendants in his medical treatment.  Even liberally construing Plaintiff's Complaints, Plaintiff's unconnected, vague allegations do not amount to a deliberate indifference claim.  The Court therefore does not consider Plaintiff to have stated a deliberate indifference claim in this Action, and will not rule on a deliberate indifference claim against Defendants.  The Court notes, however, that "it is the movant's burden to show that no genuine factual dispute exists," *Vt. Teddy Bear Co.*, 373 F.3d at 244, and Defendants have submitted no evidence whatsoever regarding Plaintiff's medical treatment.

Defendants also summarily argue that Plaintiff's claim that CO Stevens issued a false inmate misbehavior report must be dismissed. (Defs.' Mem. 16.)  The Court does not understand Plaintiff to have brought a separate claim based on a false misbehavior report.  Whether Stevens's misbehavior report was false goes to Plaintiff's due process claim, inasmuch as Stevens's report was partially the catalyst for, and the underlying facts therein were discussed during, Plaintiff's disciplinary hearing. (Defs.' 56.1 ¶ 30 (citing Levin Decl. ¶ 17; Tickets at Lebron 23).)  In his misbehavior report, Stevens states that Plaintiff hit him in the groin. (Stevens Decl. ¶ 8; Tickets at Lebron 23.)  Plaintiff states that he swung his leg but did not make physical contact with anyone during the second use of force incident. (Pl.'s Dep. at 32.)  The Video is inconclusive, (*see* Video), and "at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 247; *see also Scott*, 344 F.3d at 290–91 ("Although [the plaintiff's] evidence may be thin, his own sworn statement is adequate to counter summary judgment.").  The Court therefore does not rule on a separate false misbehavior report claim, and cannot rule that Stevens's misbehavior report did

1.  Excessive Force Claim

The Eighth Amendment guarantees freedom from "cruel and unusual punishments." U.S. Const. amend. VIII; *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[T]he Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." (citation omitted)); *Zimmerman v. Seyfert*, No. 03-CV-1389, 2007 WL 2080517, at \*23 (N.D.N.Y. July 19, 2007) ("Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmate[']s health or safety." (citing *Farmer*, 511 U.S. at 837)). "Analysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for the conduct." *Manley v. Grossman*, No. 13-CV-1974, 2017 WL 4326541, at \*8 (S.D.N.Y. Sept. 27, 2017) (citing *Wright*, 554 F.3d at 268); *see also Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) ("[A] prisoner who alleges facts from which it could be inferred that prison officials subjected him to excessive force, and did so maliciously and sadistically, states an Eighth Amendment claim on which he is entitled to present evidence.").

The objective element focuses on the harm done in light of "contemporary standards of decency," *Wright*, 554 F.3d at 268 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)); *see also*

---

not contain false information because there is a material dispute of fact as to whether Plaintiff actually hit Stevens.

Finally, Defendants also argue that they cannot be liable for both use of excessive force and failure to protect claims, (Defs.' Mem. 20 (citing *Samuels v. Fischer*, 168 F. Supp. 3d 625, 646 (S.D.N.Y. 2016))), but the single case they cite does not support their proposition. The Court in *Samuels* did not discuss whether both of those claims could be brought against a prison official but merely found that prison officials can be liable for failing to intervene. *See Samuels*, 168 F. Supp. 3d at 646. Defendants cite to no other caselaw to support their argument. "Courts need not consider cursory arguments of this kind, and the Court declines to do so here." *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at \*12 n.12 (N.D.N.Y. 2017) (citation, alterations, and quotation marks omitted).

*Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) (noting that the analysis is "context specific, turning upon contemporary standards of decency" (citation and quotation marks omitted)), and asks whether "the deprivation alleged is 'sufficiently serious,' or 'harmful enough,' to reach constitutional dimensions," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 540 (S.D.N.Y. 2005) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997)). However, "when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268–69 (alteration omitted) (quoting *Hudson*, 503 U.S. at 9).

The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* at 268 (quoting *Wilson*, 501 U.S. at 299); *see also Vail v. Fischer*, No. 12-CV-1718, 2013 WL 5406637, at *5 (N.D.N.Y. Sept. 25, 2013) (noting that an inmate must prove, "subjectively, that the defendant acted wantonly and in bad faith"). "This inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Perry v. Stephens*, 659 F. Supp. 2d 577, 582 (S.D.N.Y. 2009) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds no basis for concluding that the second use of force was "objectively 'harmful enough' or 'sufficiently serious'" to violate the Eighth Amendment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir.

2015) (quoting *Hudson*, 503 U.S. at 8). The force used against Plaintiff was de minimis, and by

his own account Plaintiff suffered almost no injury as a result of it. According to Plaintiff and

Defendants, and as evidenced by the Video, the force used against Plaintiff consisted of his being

taken to the ground by Defendants in a forceful manner and restrained on the ground after

Plaintiff kicked or attempted to kick Stevens. (*See* Mrzyglod Decl. ¶¶ 8–10; Kelly Decl. ¶¶ 4–6;

Gunsett Decl. ¶¶ 6–7; Stevens Decl. ¶¶ 8–9; Video; Pl. Dep. at 33.) Indeed, Plaintiff admits that

no other force was used against him once he was on the ground—he was not kicked or punched.

(Pl. Dep. at 33.) The only injury Plaintiff suffered was a "little bump." (*Id.*) The Court

therefore finds that Defendants' conduct in bringing Plaintiff to the ground and restraining him,

which resulted in only a "little bump," was not harmful enough to support an Eighth Amendment

excessive force claim. *See Kalwasinski v. Artuz*, No. 02-CV-2582, 2003 WL 22973420, at *6–8

(S.D.N.Y. Dec. 18, 2003) (granting summary judgment to defendants and holding that prison

official did not use excessive force in pressing prisoner's face into wall while attempting to

secure compliance and that the "amount of force used . . . was consistent with good faith attempt

to maintain prison discipline and order"); *see also Cox v. Fischer*, 248 F. Supp. 3d 471, 485–86

(S.D.N.Y. 2017) (finding use of force was not objectively harmful where officer "'slammed' [the

plaintiff] into bunk beds, pulled his right arm behind his back, pushed his face towards a wall,

and shoved him into two lockers"); *Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 480–81

(S.D.N.Y. 2011) (granting summary judgment to defendants because officers did not use

excessive force under the Eighth Amendment in "punching [an inmate] in the head and arm" and

placing the inmate in an "extended chokehold," where a medical report indicated that the inmate

had suffered "at most, some swelling on the left side of his face"); *Perry*, 659 F. Supp. 2d at 582

(finding that officers' conduct in slapping and choking an inmate was not sufficiently severe,

where the inmate suffered "a little bruise" and "minor pain that abated after 'about four days'");

*James v. Phillips*, No. 05-CV-1539, 2008 WL 1700125, at *5 (S.D.N.Y. Apr. 9, 2008) (holding

that officers did not use excessive force in shoving an inmate into a door, where the inmate

suffered swelling on his chin).

Even if Defendants' conduct during the second use of force incident had been sufficiently

severe, Plaintiff neither alleged nor provided any evidence regarding the state of mind of any of

the Defendants who forced him to the ground. Unrelated to the second use of force incident,

Plaintiff states that Mrzyglod threatened him before the use of force incidents, (FAC ¶ 29), and

alleges broadly that there was a plot to plant evidence against him at the scene of the first use of

force incident, (SAC at 2). However, Mrzyglod was not one of the officers to force Plaintiff to

the ground, and Plaintiff does not specify that the officers who allegedly planted evidence

against him were the same officers who forced him to the ground. Defendants, on the other

hand, submit evidence that they used force only because Plaintiff kicked or attempted to kick

Stevens in the groin and only to restrain Plaintiff to prevent him from harming himself or others.

(*See* Kelly Decl. ¶¶ 4–5, 8; Gunsett Decl. ¶¶ 6–9; Stevens Decl. ¶¶ 8–10; Video.) Thus, Plaintiff

cannot satisfy the subjective component of his excessive force claim. *See Perry*, 659 F. Supp. 2d

at 583 (granting summary judgment to the defendants where court found that an inmate relying

on conclusory assertions failed to set forth evidence that an officer had "sought to wantonly

inflict pain" when that officer had used de minimis force in response to the plaintiff's refusal to

obey a direct order and the inmate's attempt to kick that officer); *Kalwasinski*, 2003 WL

22973420, at *6 (holding that prison official did not act maliciously when he pressed prisoner's

face into a wall in attempt to secure compliance where the prisoner was arguing with him about

manner in which he was conducting a pat frisk).

Accordingly, Defendants are entitled to summary judgment as to the second use of force incident.

### 2.  Due Process Violation Claim

Plaintiff alleges that Levine violated his due process rights during his disciplinary hearing by: failing to investigate why certain witnesses Plaintiff had requested at his hearing refused to testify; improperly denying Plaintiff the ability to call certain witnesses without explaining the basis for his refusal; failing to investigate where the weapon Plaintiff allegedly had on December 26, 2013, came from, how Plaintiff smuggled it, and where the weapon was taken after the use of force incident; refusing/failing to ask specific questions Plaintiff wanted asked of certain witnesses; and improperly determining Plaintiff's guilt despite knowing that the staff members involved in the use of force incidents were allegedly lying.  (FAC ¶¶ 46–51; SAC at 6–7.) Levine ultimately sentenced Plaintiff to fourteen months in the SHU and fourteen months of loss of packages, commissary, phone usage, and good time.  (Levin Decl. ¶ 26; Hearing Form at 123.)

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation, alteration, and quotation marks omitted).  The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).  However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  The Second Circuit has explained that "[t]he length of disciplinary

confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test." *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citation and quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). "The court may resolve the issue of atypicality as a matter of law only when the conditions are uncontested." *Houston v. Cotter*, 7 F. Supp. 3d 283, 297 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 65). Indeed, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66; *see also Houston*, 7 F. Supp. 3d at 298 (same).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "[P]rison discipline decisions

affecting an inmate's liberty interest cannot be 'imposed arbitrarily' but must be 'supported by some evidence in the record.'" *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004) (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). "Judicial review of this 'some evidence' standard is narrowly focused": "it 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id.* (quoting *Hill*, 472 U.S. at 455–56). Finally, "the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (italics omitted) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

It is undisputed that Plaintiff has satisfied the first element of his due process claim, as his 14-month confinement in SHU exceeds the 101-day threshold set forth by the Second Circuit. *See Palmer*, 364 F.3d at 65–66. The issue before the Court is therefore limited to whether Plaintiff's disciplinary hearing comported with due process.

Defendants argue that Plaintiff was provided all the process due him at his hearing. (Defs.' Mem. 13.) Plaintiff was provided advanced written notice of the charges against him. (Levine Decl. ¶¶ 8, 17; Tickets; Hearing Form at Lebron 123.) Plaintiff was permitted to mount a defense by calling witnesses and posing questions to those witnesses. (Levine Decl. ¶¶ 21, 24; Hearing Form at Lebron 124; Witness Forms; Pl. Dep. at 63.) And Levine issued a written statement of the evidence relied on in reaching his decision. (Levine Decl. ¶¶ 25–26; Hearing Form at 123–28; Hr. Tr. at Lebron 800–05.)

a.  Calling Witnesses

As to Levine's denial of Plaintiff's request to call certain witnesses at the disciplinary

hearing, "[o]rdinarily, an 'inmate facing disciplinary proceedings should be allowed to call

witnesses and present documentary evidence in his defense when permitting him to do so will

not be unduly hazardous to institutional safety or correctional goals.'"  *Holland v. Goord*, 758

F.3d 215, 224–25 (2d Cir. 2014) (quoting *Wolff*, 418 U.S. at 566).  "The right to call witnesses is

limited in the prison context, however, 'by the penological need to provide swift discipline in

individual cases' and 'by the very real dangers in prison life which may result from violence or

intimidation directed at either other inmates or staff.'"  *Id.* at 225 (quoting *Ponte v. Real*, 471

U.S. 491, 495 (1985)).  Accordingly, "prison officials must have the necessary discretion to keep

the hearing within reasonable limits and to refuse to call witnesses that may create a risk of

reprisal or undermine authority, as well as to limit access to other inmates to collect statements

or to compile other documentary evidence."  *Id.* (citation, alteration, and quotation marks

omitted).  Moreover, the Second Circuit has "stated that '[t]he Supreme Court . . . has suggested

that a prisoner's request for a witness can be denied on the basis of irrelevance or lack of

necessity.'"  *Id.* (alterations in original) (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30–

31 (2d Cir. 1991)).  Therefore, the Second Circuit has held that "[t]he refusal to call witnesses

whose testimony would be redundant is not a violation of any established due process right."  *Id.*

However, "a prison official who refuses to call a requested witness has a constitutional

obligation to explain to the prisoner-defendant why the witness was not allowed to testify."

*Abdur-Raheem*, 2015 WL 667528, at *7 (citing, inter alia, *Ponte*, 471 U.S. at 497); *see also*

*Colantuono v. Hockeborn*, 801 F. Supp. 2d 110, 114 (W.D.N.Y. 2011) (same).  "The reasons

need not be in writing, and may be provided at the disciplinary hearing itself or by presenting

testimony in court when there is later constitutional challenge to the hearing." *Abdur-Raheem*, 2015 WL 667528, at *7. Finally, "to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." *Colantuono*, 801 F. Supp. 2d at 114 (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

Plaintiff requested that ten inmates be called to testify. Of these ten inmates, only three agreed to testify. The remaining seven refused to testify or were unavailable to testify. (Defs.' 56.1 ¶¶ 34–35 (citing Levin Decl. ¶ 21; Witness Forms at Lebron 147–56, 210).) Levine had no means of forcing an inmate to testify or of interrogating him outside of the context of the hearing. (*Id.* ¶ 36 (citing Levin Decl. ¶ 22).) Levine allowed Plaintiff to call fifteen staff members to testify. (*Id.* ¶ 37 (citing Levin Decl. ¶ 24; Hearing Form at Lebron 124–25; Witness Interview Notice Forms; Hr. Tr. at Lebron 595–96).) Levine denied Plaintiff's request to call several additional staff members as witnesses because they were not present for the use of force incidents, did not have relevant information, or were redundant. (*Id.* ¶ 38 (citing Levin Decl. ¶ 24).) This, pursuant to Second Circuit precedent, is a sufficient basis for refusing to call certain additional witnesses. *See Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (holding that the witnesses were not present at the incident, "thus providing [the defendant] with a rational basis for concluding that the testimony of these additional witnesses would be irrelevant or unnecessary," and therefore not a violation of due process (citation omitted)); *Scott v. Kelly,* 962 F.2d 145, 147 n.2 (2d Cir. 1992) ("We must defer to the judgment of prison officials in balancing prisoners' rights against penological interests, absent a showing of abuse of discretion."); *Odom v. Kerns*, No. 99-CV-10668, 2008 WL 2463890, at *9 (S.D.N.Y. June 18, 2008) ("While [the] [p]laintiff has a right to call witnesses in his defense, the correctional facility may deny the

request 'for irrelevance, lack of necessity, or the hazards presented in individual cases.'"

(quoting *Wolff*, 418 U.S. at 566)); *Branch v. Goord,* No. 05-CV-6495, 2006 WL 2807168, at *5

(S.D.N.Y. Sept. 28, 2006) (holding that requested witnesses who did not see events in question

were irrelevant).  Accordingly, Plaintiff has not raised a triable issue of fact as to whether the

denial of his requests to call witnesses constituted a denial of due process.

### b.  Questioning Witnesses

"While inmates have the right to question witnesses at their disciplinary hearings, that

right is not unlimited, and its contours are under the discretion of prison officials."  *Rivera v.*

*Wohlrab*, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002); *see also Lewis v. Murphy*, No. 12-CV-268,

2014 WL 3729362, at *11 (N.D.N.Y. June 24, 2014) (upholding the authority of a hearing

officer to "administer the questioning in a manner he saw fit").

The Parties dispute to what extent Levine asked questions about the weapon that was

allegedly found on Plaintiff prior to the first use of force incident.  Defendants argue that

testimony about that weapon was solicited during the hearing.  (Defs.' Mem. 15.)  Defendants

are correct that some testimony about the weapon was solicited.  Captain Melville testified about

the process by which the razor was moved from the "drop box to the contraband room," and why

there was a delay from December 26 to December 31, 2013 in moving the razor.  (Hr. Tr. at

Lebron 691–94.)  At the end of the short selection of hearing transcript that Defendants

submitted, Plaintiff stated that he wanted to ask Melville a question, specifically how many

Captains were assigned to the facility.  Levine stated, "we've already gone through that," (*id*. at

694), however, Defendants did not submit the portion of the hearing transcript in which

Plaintiff's potentially relevant question about the Captains and their role in transferring

contraband was asked or answered.  Defendants include one page of Williams's testimony in

which he stated that the garbage cans where the razor was found were not close enough for Plaintiff to reach, and that the discarded item or weapon he observed was a two-inch razor blade. (Hr. Tr. at Lebron 559.)

Bader testified that "inmate Lebron . . . ditched . . . some sort of little object over by the garbage and then when they called him, he turned toward Officer Williams, and . . . had his fists up." (Hr. Tr. at Lebron 398.) Bader also testified that at that time he tackled and tried to restrain Plaintiff. (*Id*. at Lebron 399.) Bader further testified that he "just saw [Plaintiff] throw something to the garbage cans" but "didn't see his hands before that . . . [he] just saw something leave his hand." (*Id*. at Lebron 401.) During Bader's testimony, Plaintiff instructed Levine to ask Bader whether he saw Plaintiff take the weapon out of his pocket, mouth, pants, or whether he had it in his hand. (*Id*. at Lebron 403.) Levine asked Bader this question, and Bader replied that he did not see where the weapon came from. (*Id*.)

Plaintiff, on the other hand, states that Levine "never questioned how I smuggled a weapon or anything else, where did they see me pull it from? He never said nothing. He never questioned the officers. And I asked him that in the hearing. Like how did I strike them or whatever the case may be?" (Pl. Dep. 64.)

Defendants admittedly have submitted some evidence about where the razor was found and how it was transported and stored in the facility, but they have failed to submit the other portions of hearing transcript during which the role of captains and storing contraband was discussed. (Hr. Tr. 694.) And Defendants have submitted excerpts of the testimony of one CO, out of the fifteen who testified, regarding where the weapon was on Plaintiff when he allegedly threw it. Defendants did not submit the hearing testimony of any of the other COs involved in the use of force incident, so there is no evidence what anyone other than Bader said about where

the weapon was on Plaintiff or where it came from. (Hr. Tr. at Lebron 401–03.) Levine's brief written disposition also only cites Bader's statements regarding the weapon, but makes no mention of what the other witnesses said, if anything, about where on Plaintiff the weapon was or how Plaintiff smuggled the weapon in. (Hearing Form at Lebron 128.) Plaintiff states that at the time of the first incident he had his legal books in one hand and his identification card in the other, (FAC ¶ 2), and thus sought to question the witnesses about the weapon they alleged they saw on him. The Court therefore cannot resolve this issue of material fact about whether the witnesses at the disciplinary hearing, aside from Bader, were asked about where the weapon was on Plaintiff, where he pulled it from, and how he smuggled it in. *See Muhammad v. Pico*, No. 02-CV-1052, 2003 WL 21792158, at *15 (S.D.N.Y. Aug. 5, 2003) (denying summary judgment on due process claim where the parties disputed what happened at the disciplinary hearing and the court did not have all the transcripts and tapes documenting the disciplinary hearing); *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *11 (S.D.N.Y. Sept.12, 2002) (denying motion to dismiss because "[d]efendants have failed to submit . . . a transcript of the disciplinary hearing . . . without [which] . . . it is difficult for this [c]ourt fully to evaluate the merits of the parties' arguments").

The first ticket charged Plaintiff with possessing a weapon, attempting to discard that weapon, and violently resisting officers' efforts to subdue him. (Defs.' 56.1 ¶ 29 (citing Levin Decl. ¶ 17; Tickets at Lebron 22).) Whether Plaintiff possessed the weapon and where it was on Plaintiff are facts central to determining whether Levine appropriately found Plaintiff guilty of the charges in the first ticket, and yet Defendants did not submit the transcript of the other COs who testified. "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no

opposing evidentiary matter is presented." *Vt. Teddy Bear Co.*, 373 F.3d at 243 (citation, emphasis, and quotation marks omitted); *see also Noval Williams Films LLC v. Branca*, No. 14-CV-4711, 2018 WL 389092, at *5–6 (S.D.N.Y. Jan. 11, 2018) (denying summary judgment where party failed to meet its burden to prevail on summary judgment).

Accordingly, Defendants' Motion is denied with respect to Plaintiff's due process claim.[11]

### 3. Defendant Lee — Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal[;] failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

---

[11] Plaintiff also summarily states that Levine knew that the COs statements against Plaintiff were untrue, (FAC ¶ 48), but the Court does not consider this unsupported statement to create a dispute of fact as to Plaintiff's due process claim and the Court does not consider Levine's knowledge of any CO's lies as one of the grounds on which Plaintiff's disciplinary hearing would have been procedurally deficient. *See Jeffreys v. City of New York*, 426 F.3d 549, 554–55 (2d Cir. 2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence"); *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1998) ("Statements [(for example, those made in affidavits, deposition testimony or trial testimony)] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.").

*Id.* at 139 (italics and quotation marks omitted). Accordingly, for Plaintiff's due process claim to go forward against Lee, Lee must fall into one of the five categories identified above. *See Lebron*, 2017 WL 365493, at *4 (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff alleges that Lee was deliberately indifferent to his safety by failing to protect him from being assaulted on December 26, 2013 after Plaintiff filed a grievance two weeks before the use of force incidents. (FAC ¶ 53.) Defendants argue that Plaintiff has failed to demonstrate that Lee was personally involved in any wrongdoing because Plaintiff's grievance regarding the alleged threat from Mrzyglod was not filed, and Lee did not learn of the grievance, until January 2, 2014, nearly a week after the December 26, 2013 use of force incidents. (Defs.' Mem. 18.)

Lee states that he received a copy of Inmate Grievance No. GH-76369-14 on January 2, 2014, and that Plaintiff filed his grievance on that date. (Defs.' 56.1 ¶ 47 (citing Lee Decl. ¶ 6; Initial Superintendent Review of Grievance No. GH-76369-14.) The date on Plaintiff's grievance letter itself, however, is December 21, 2013. (Dec. 21 Grievance Letter.) And Plaintiff alleges that he filed a grievance about Mrzyglod's alleged threat two weeks before the use of force incidents. (FAC ¶ 53.) The Court notes that on the first page of Plaintiff's letter, there is a notation in the top right corner that says "1/2/14," but it is not clear to the Court that this is Plaintiff's writing, as there are what appear to be "FM" initials next to the "1/2/14" date, and there are also other illegible notations that could be official notations. (*See* Dec. 21 Grievance Letter.) When Plaintiff filed his grievance and when Lee received it is thus in dispute.

The Court cannot at this stage decide to credit Lee's version of events that Plaintiff first filed Grievance No. GH-76369-14 on January 2, 2014. Nor can the Court conclude that Lee

assigned staff to investigate Grievance No. GH-76369-14. Defendants correctly point out that Lee eventually assigned facility staff to investigate the allegations in Grievance No. GH-76475-14, which Plaintiff filed on January 21, 2014, after the use of force incidents. (Lee Decl. ¶ 8, Grievance No. GH-76475-14.) But this was an entirely separate grievance, and it is not clear from the record what kind of an investigation was actually conducted with respect to Grievance No. GH-76369-14. Plaintiff's Grievance No. GH-76369-14 was ultimately denied on August 27, 2014, Plaintiff appealed the denial on September 15, 2014, and Defendants have submitted no further documentation regarding how Grievance No. GH-76369-14 was ultimately resolved. (Grievance No. GH-76369-14 Appeal.)

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court is not able to conclude that a reasonable jury must necessarily find that Plaintiff did not file Grievance No. GH-76369-14 until January 2, 2014 and that Lee took reasonable steps to investigate and protect Plaintiff from Mrzyglod's threats. The Court

therefore denies Defendants' Motion with respect to dismissing Lee from the case for lack of personal involvement.[12, 13]

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's excessive force claim arising out of the second use of force incident, denies the Motion with respect to Plaintiff's due process claim, and denies the Motion as to Lee.

---

[12] Plaintiff also summarily alleges that Lee failed to conduct background investigations of the COs and to appropriately train the COs.  Plaintiff alleges that such an investigation would have revealed that those officers were involved in several incidents of physical violence.  (SAC at 3, 5.)  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).  Here, Plaintiff does not name specific COs or offer any factual allegations regarding previous instances of violence, or explain the basis of his personal knowledge regarding Lee's background investigation and training of the COs.  Plaintiff has not pointed to any admissible evidence regarding Lee's hiring and training practices.  Therefore, the Court will not consider Plaintiff's unsupported allegations regarding Lee's hiring and training practices.  *See Baity*, 51 F. Supp. 3d at 419–20 (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on [the] [p]laintiff's personal knowledge and conclusory statements that are nothing more than speculation").

[13] The Court declines to consider at this time whether any Defendant is protected by qualified immunity.  Defendants argue that the COs involved in the second use of force incident are entitled to qualified immunity for their use of force.  (Defs.' Mem. 22).  Because the Court grants Defendants' Motion with respect to the second use of force incident, it need not address Defendants' qualified immunity argument as to this claim.  As to Lee and Levine, Defendants' qualified immunity "arguments" run to one short paragraph as to each and fail to meaningfully apply the qualified immunity caselaw to this case.  (Defs.' Mem. 23.)  This is insufficient to raise a qualified immunity claim.  *See Johnson v. Doty*, No. 15-CV-7823, 2019 WL 2137361, at *3 n.4 (S.D.N.Y. May 16, 2019) (declining to consider qualified immunity argument where defendants "merely restate[d] the qualified immunity caselaw without meaningfully applying that caselaw to the facts of th[e] case"); *Ben-Reuben v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at *4 n.1 (S.D.N.Y. Mar. 28, 2019) (same); *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *19 n.17 (S.D.N.Y. Dec. 21, 2018) (same).

The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 97.) The

Court will hold a Status Conference on September 5, 2019 at 10:00 a.m.

SO ORDERED.

Dated:     July 1 9 2019
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

44