UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGEL D. LEBRON, JR.,

                              Plaintiff,

v.

SGT MICHAEL F. MRZYGLOD, *et al.*,

                              Defendants.

No. 14-CV-10290 (KMK)

OPINION & ORDER

Appearances:

Angel D. Lebron, Jr.
Woodbourne, NY
*Pro Se Plaintiff*

Neil Shevlin, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Angel D. Lebron, Jr. ("Plaintiff"), an inmate proceeding pro se, brings this Action against

Sergeant Michael Mrzyglod ("Mrzyglod"), Correction Officer ("CO") Barry A. Stevens

("Stevens"), CO Ryan A. Kelly ("Kelly"), CO Ryder S. Bader ("Bader"), CO William J.

Williams ("Williams"), retired Commissioner's Hearing Officer Bruce Levine ("Levine"),

Clifford K. Gunsett ("Gunsett"), and Superintendent William Lee ("Lee") (collectively,

"Defendants"), employees of the New York State Department of Correction and Community

Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his

Eighth and Fourteenth Amendment rights when he was assaulted without cause and punished for

his alleged misbehavior by being subjected to a procedurally deficient disciplinary hearing. (*See*

First Am. Compl. ("FAC") (Dkt. No. 47); Second Am. Compl. ("SAC") (Dkt. No. 67).) Before

the Court is Defendants' Supplemental Motion for Partial Summary Judgment (the

"Supplemental Motion"). (*See* Not. of Suppl. Mot. (Dkt. No. 118).) For the reasons explained

herein, the Supplemental Motion is granted.

## I. Background

### A. Factual Background

The Court has extensively described the factual allegations and procedural history of this

case in the Opinion & Order partially granting the Defendants' Motion for Summary Judgment

(the "First Opinion"). (Op. & Order ("First Op.") 2–22 (Dkt. No. 113).) The Court therefore

assumes familiarity with the dispute and will provide factual and procedural background only as

relevant to the instant Supplemental Motion.[1]

The following facts are taken from Defendants' supplemental statements pursuant to

Local Civil Rule 56.1, (Defs.' Suppl. Local Rule 56.1 Statement in Supp. of Suppl. Mot. ("Defs.'

Suppl. 56.1") (Dkt. No. 119)), Plaintiff's Complaint, FAC, and SAC, and the admissible

evidence submitted by the Parties.[2] Defendants have sent the required Rule 56.2 Notice to

Plaintiff. (*See* Dkt. No. 120.)

---

[1] The Supplemental Motion "only addresses the claims against Lee and Levine." (Defs.' Mem. in Supp. of Suppl. Mot. ("Defs.' Suppl. Mem.") 1 n.1 (Dkt. No. 122).) Defendants are not moving and have not moved with respect to the "excessive force claim in Green Haven's F and G Corridor," which is described as the first use of force incident in the First Opinion. (*Id.*; *see* First Op. at 5–7.)

[2] Although "a plaintiff's pro se status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment," *Almonte v. Florio*, No. 02-CV-6722, 2004 WL 60306, at *3 n.10 (S.D.N.Y. Jan. 13, 2004) (citation and italics omitted), where a plaintiff "verifie[s] his complaint by attesting under penalty of perjury that the statements in the complaint [are] true to the best of his knowledge," the "verified complaint is to be treated as an affidavit for summary judgment purposes," *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Patterson v. County of Oneida*, 375 F.3d

### 1. The Parties

Plaintiff is currently incarcerated at Woodbourne Correctional Facility. On December 26, 2013, during the relevant time period, Plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven"). (Defs.' Suppl. 56.1 ¶ 1.)[3]

Lee, currently the Superintendent of Eastern Correctional Facility, was employed as the Superintendent of Green Haven, from September 3, 2009 to November 16, 2014. (*Id.* ¶ 2 (citing Decl. of William Lee in Supp. of Suppl. Mot. ("Lee Suppl. Decl.") ¶ 2 (Dkt. No. 121-10)).)

---

206, 219 (2d Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment").

    Here, Plaintiff's Complaint, FAC, and SAC each includes a signed and dated verification page stating that Plaintiff declares the contents of those filings to be true under the penalty of perjury. (Compl. 8; FAC 10; SAC 15–16.) Therefore, the Court will accept for purposes of this Supplemental Motion all admissible facts set forth in Plaintiff's Complaint, FAC, and SAC, that are based on Plaintiff's personal knowledge and about which Plaintiff is competent to testify. *See Colon*, 58 F.3d at 872 ("A verified complaint is to be treated as an affidavit for summary judgment purposes . . . provided that it meets the other requirements for an affidavit under Rule 56(e) . . . requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit . . . ."); *James v. Gage*, No. 15-CV-106, 2019 WL 1429520, at *7 (S.D.N.Y. Mar. 29, 2019) (finding it appropriate to consider pro se plaintiff's first amended complaint as well as opposition papers in deciding a motion to dismiss); *Jenkins v. Chase Bank USA, N.A.*, No. 14-CV-5685, 2015 WL 4988103, at *1 n.1 (E.D.N.Y. Aug. 19, 2015) ("The Court may . . . draw on facts alleged in the [c]omplaint and [a]mended [c]omplaint because even though the [s]econd [a]mended [c]omplaint is the operative pleading, the [c]ourt may still credit admissions in the original complaint and attached exhibits." (citation, alteration, and quotation marks omitted)); *Poindexter v. EMI Record Grp. Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("[E]ven though the [a]mended [c]omplaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits" (citation omitted)); *Johnson v. Doe*, No. 00-CV-3920, 2001 WL 314618, at *1 (S.D.N.Y. Mar. 30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes . . . mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence." (citation omitted)).

    [3] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party must then submit "a

Levine is currently retired from DOCCS, but he worked as a Hearing Officer from 2010

to 2014.  (*Id.* ¶ 3.)  In this capacity, he was responsible primarily for conducting Tier III

---

correspondingly numbered paragraph responding to each numbered paragraph in the statement of
the moving party, and if necessary, additional paragraphs containing a separate, short[,] and
concise statement of additional material facts as to which it is contended that there exists a
genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a
fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to
the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation
marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A
nonmoving party's failure to respond to a Rule 56. 1 statement permits the court to conclude that
the facts asserted in the statement are uncontested and admissible.")  "A pro se litigant is not
excused from this rule."  *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL
1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted).  Here, Defendants filed
and served their Supplemental 56.1 Statement, (Defs.' Suppl. 56.1), in addition to a statement
notifying Plaintiff of the potential consequences of not responding to the Motion, as required by
Local Rule 56.2, (Dkt. No. 120).  Despite this notice, Plaintiff failed to submit a response to
Defendants' Supplemental 56.1 Statement of Facts.  Accordingly, the Court may conclude that
the facts in Defendants' Supplemental 56.1 Statement are uncontested and admissible.  *See
Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit
a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material
issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL
4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

   Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when
confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d
Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record,"
when deciding the instant Supplemental Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d
Cir. 2001) (citation and quotation marks omitted); *see also Houston v. Teamsters Local 210,
Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y.
2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently
reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs
referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013
WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the
[motions for summary judgment] in light of the entirety of the record to afford [the pro se]
[p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a
Rule 56.1 response (citation omitted)); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872,
2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a
proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains
some discretion to consider the substance of the plaintiff's arguments, where actually supported
by evidentiary submissions." (italics and quotation marks omitted)).  The Court will therefore
consider whether any facts in the record or in Plaintiff's Complaint, FAC, and SAC, contradict
Defendants' Supplemental 56.1 Statements.

disciplinary hearings.  (*Id*. (citing Decl. of Bruce Levine in Supp. of Suppl. Mot. ("Levine Suppl. Decl.") ¶ 2 (Dkt. No. 121-1)).)

### 2.  The Disciplinary Hearing

Plaintiff states that Levine, the Hearing Officer at his disciplinary hearing, failed to fully investigate the first use of force incident and denied Plaintiff's requests to call various witnesses. (FAC ¶¶ 46–47.)  Plaintiff posits that had Levine conducted a thorough investigation, the outcome of his hearing may have been different.  (*See id.* ¶ 51.)  A more thorough description of the events surrounding the disciplinary hearing can be found in the First Opinion.  (First Op. 10–20.)  A summary of the events relevant to this Supplemental Motion is below.

On December 26, 2013, CO Bader drafted an Inmate Misbehavior Report ("MBR") in connection with the use of force that took place earlier that day in the F and G Corridor.  (Defs.' Suppl. 56.1 ¶ 5 (citing Levine Suppl. Decl. ¶ 16; Levine Suppl. Decl. Ex. MBR ("Ex. MBR") (Dkt. No. 121-7).)  The MBR accused Plaintiff of possessing a weapon, specifically a razor blade, attempting to discard that weapon, and then acting aggressively toward officers and violently resisting their efforts to subdue him.  (Ex. MBR.)  That ticket charged Plaintiff with the following rule violations: Violent Conduct (104.11), Direct Order (106.10), Interference (107.10), Possession of a Weapon (113.10), Search and Frisk Procedures (115.10), and Smuggling (114.10).  (*Id*.)

Between January 10, 2014 and March 5, 2014, Levine conducted a Tier III Hearing for the MBR drafted by Bader, along with another MBR related to a second use of force incident at Green Haven on December 26, 2013 in the Special Housing Unit ("SHU").  (Defs.' Suppl. 56.1

5

¶ 6 (citing Levine Suppl. Decl. ¶ 3; Tier III Hearing Transcript ("Hr'g Tr.") (Dkt. Nos. 121-2–5)).)[4]

Plaintiff called a number of witnesses who had some involvement with the first use of force incident.  (Defs.' Suppl. 56.1 ¶ 7 (citing Levine Suppl. Decl. ¶ 17).)  Levine allowed Plaintiff to call fifteen staff members to testify.  (Defs.'56.1 in Supp. of First Mot. ("Defs.' First 56.1") ¶ 37 (citing Decl. of Bruce Levine in Supp. of First Mot. ("First Levine Decl.") ¶ 24) (Dkt. No. 99).)  Levine denied Plaintiff's request to call several additional staff members as witnesses because they were not present for the use of force incidents, did not have relevant information, or were redundant.  (*Id*. ¶ 38 (citing First Levine Decl. ¶ 24 (Dkt. No. 101-9)).)

a.  Mrzyglod's Testimony

Plaintiff called Mrzyglod to testify on January 27, 2013.  (Defs.' Suppl. 56.1 ¶ 8 (citing Levine Suppl. Decl. ¶ 17).)  Levine asked Mrzyglod a number of questions regarding Plaintiff's alleged possession of the razor, including: whether Mrzyglod saw the weapon at issue, to which Mrzyglod responded that he did, (Defs.' Suppl. 56.1 ¶ 8; Hr'g Tr. at Lebron 293)[5]; whether he saw where the weapon was found, to which he responded that "it was where the garbage cans were," (Defs.' Suppl. 56.1 ¶ 8; Hr'g Tr. at Lebron 293); where the garbage cans were located, to which he responded that they were "behind the gate that goes down H block" and "directly across from the officer's bubble" (Defs.' Suppl. 56.1 ¶ 8; Hr'g Tr. at Lebron 293); whether Mrzyglod could describe the weapon, to which Mrzyglod stated he could not "recall what the weapon" looked like "at this time," (Hr'g Tr. at Lebron 293); and whether Mrzyglod saw how the use of force incident began, to which he responded that he did not see "the very beginning of

---

[4] The second use of force incident is described in the First Opinion.  (First Op. 7–9.)

[5] The Court cites to the Bates stamped numbers at the bottom of the Hearing Transcript.

it" because, at the time, he was "directing inmates through the gate," (*id*. at Lebron 293–94.) Mrzyglod first saw Plaintiff when he was "on the ground, facedown and the officers were attempting to cuff him," and noted that throughout this attempt to restrain him, Plaintiff was being "non-compliant" and "threatening just about everybody that he saw." (*id*. at Lebron 294–95.)

Plaintiff then asked a number of questions to Mrzyglod through Levine, including: whether Mrzyglod saw Plaintiff as he was coming through the line of inmates on their way to the J school, to which Mrzyglod responded that he did not, (Defs.' Suppl. 56.1 ¶ 9; Hr'g Tr. at Lebron 300); whether Mrzyglod assaulted or saw anyone else assault Plaintiff in the F and G corridor on December 26, 2013, to which he responded that he did not see either, (Defs.' Suppl. 56.1 ¶ 9; Hr'g Tr. at Lebron 302, 304); whether Mrzyglod could recall which officers were present at the F and G corridor on December 26, 2013, to which he responded that he could recall that Williams and Bader were present, (Defs.' Suppl. 56.1 ¶ 9; Hr'g Tr. at Lebron 306); whether Mrzyglod saw any injuries to Plaintiff following the incident, to which he responded that he did not remember what injuries Plaintiff had, (Defs.' Suppl. 56.1 ¶ 9; Hr'g Tr. at Lebron 308–09); and whether Mrzyglod had planted the weapon on Plaintiff to cover up his assault on Plaintiff, to which he responded that he did not, (Defs.' Suppl. 56.1 ¶ 9; Hr'g Tr. at Lebron 312).

Plaintiff did not seek to ask Mrzyglod how Plaintiff could have smuggled the weapon in question, whether Mrzyglod saw where Plaintiff pulled the weapon from before throwing it on the ground, or whether Mrzyglod could explain how Plaintiff was able to smuggle in a weapon if Plaintiff was holding an ID card in one hand and a legal folder in another; accordingly, Levine did not ask Mrzyglod any such questions. (Defs.' Suppl. 56.1 ¶ 10 (citing Levine Suppl. Decl. ¶ 20).)

Levine declined to ask some of the questions that Plaintiff suggested, including: how many use of force incidents Mrzyglod had participated in from July 2013 to January 2014, which Levine declined to ask because it was not relevant, (Hr'g Tr. at Lebron 303); whether Mrzyglod was "one of the leaders of the beat-up squad[] operating . . . in Green Haven," which Levine declined to ask because it was not relevant, (*id.*); and whether Mrzyglod had ever asked "a nurse, or his wife . . . to cover up the injuries of the assault on [Green Haven] prisoners," which Levine declined to ask because it was not relevant, (*id.* at Lebron 307).

### b. Gunsett's Testimony

Gunsett testified later on January 27, 2014. (Defs' Suppl. 56.1 ¶ 11 (citing Levine Suppl. Decl. ¶ 21; Hr'g Tr. at Lebron 320–31).) Levine asked Gunsett a number of questions, including: what Gunsett's assignment was on December 26, 2013, to which he responded that he could not recall, (Defs.' Suppl. 56.1 ¶ 11; Hr'g Tr. at Lebron 320–21); whether Gunsett saw any part of the use of force incident in the F and G corridor, to which he responded that he had not and he was only asked to escort Plaintiff away after the incident, (Defs.' Suppl. 56.1 ¶ 11; Hr'g Tr. at Lebron 321–22); whether Gunsett thought that Plaintiff appeared "threatening," to which he responded that Plaintiff was "yelling" and "threatening everybody," saying that if he saw them "out on the street in his area, he [would] kill [them]," (Hr'g Tr. at Lebron 322); and whether Gunsett recalled observing any injuries to Plaintiff, to which Gunsett responded that he did not, (Defs.' Suppl. 56.1 ¶ 11; Hr'g Tr. at Lebron 323).

Plaintiff was then given the opportunity to question Gunsett, and he proceeded to ask a number of questions through Levine, including: whether Gunsett was present when Plaintiff "passed through the call-out line to J school" on the day of the incident, to which Gunsett responded he was not and only "arrived when [Plaintiff] was in handcuffs," (Defs.' Suppl. 56.1

¶ 12; Hr'g Tr. at Lebron 323–24); and whether Gunsett reported to the F and G corridor in response to an emergency call, to which he responded that he could not remember, (Defs.' Suppl. 56.1 ¶ 12; Hr'g Tr. at Lebron 327).

Although prompted by Plaintiff to do so, Levine declined to ask Gunsett how many use of force reports he had been involved in from July 2013 to January 2014, because it was not relevant. (Hr'g Tr. at Lebron 324.)

### c. Bader's Testimony

On January 29, 2014, Bader testified, and Levine asked him a number of questions, including: what Bader recalled of the incident in the F and G corridor, to which responded that he recalled seeing Plaintiff "ditch[] . . . some sort of little object over by the garbage" and then, when Plaintiff was called, seeing Plaintiff have "his fists up" while facing Williams, at which point Bader tackled Plaintiff, (Defs.' Suppl. 56.1 ¶ 14; Hr'g Tr. at Lebron 398–99); whether contraband was found, to which Bader responded that "there ended up being a razor [with a] cardboard handle type thing with tape on it," (Hr'g Tr. at Lebron 399); who found the contraband, to which Bader responded that he had discovered it by the garbage cans, (Defs.' Suppl. 56.1 ¶ 14; Hr'g Tr. at Lebron 399); and what subsequently happened to the weapon, to which Bader responded that he held on to it while the paperwork was being done, that it later got photographed, and that Bader then put it in the contraband locker, (Defs.' Suppl. 56.1 ¶ 14; Hr'g Tr. at Lebron 399–400).

Plaintiff then asked some questions to Bader through Levine, including: whether Plaintiff had a legal folder and ID with him at the time of the incident, to which Bader said that he did not remember, (Defs.' Suppl. 56.1 ¶ 15; Hr'g Tr. at Lebron 401); whether Bader saw Plaintiff when Plaintiff was being directed to sit in "the boss chair," to which Bader

responded that he saw Plaintiff "walking over towards being directed and then [] saw something leave [Plaintiff's] hand," which ended up on the floor near the garbage cans, (Hr'g Tr. at Lebron 402); at what time Bader used force on Plaintiff, to which Bader responded that he could not remember, (*id.*); whether Bader recalled where Plaintiff pulled the weapon out from, to which he responded that he "didn't see where it came from" and only saw "something leave [Plaintiff's] hand," (*id.* at Lebron 403); whether the weapon had plastic on it, to which Bader responded that he only remembered the weapon being a razor blade, (Defs.' Suppl. 56.1 ¶ 16; Hr'g Tr. at Lebron 404); whether Bader saw Plaintiff drop his ID and legal folder when he "allegedly squared off at [Williams]," to which he responded that he did not remember seeing that, (Hr'g Tr. at Lebron 404); whether inmates must show their ID cards when they are "on the call out line to proceed to J school," to which Bader responded that typically, inmates show the escorting officer their ID, (*id.* at Lebron 405); what happened to Plaintiff's legal folder, hat, sneakers, and scarf that he had on that night, to which Bader responded that he did not remember, (*id.* at Lebron 405–06); where Bader was when he saw Plaintiff throw the weapon towards the garbage can, to which Bader responded that he was likely close to one of the gates but could not recall exactly, (*id.* at Lebron 406–07); how many correction officers were present at the F and G corridor at the time of the incident, to which Bader responded that he could not recall, (*id.* at Lebron 407); whether Bader knew anything about Mrzyglod's alleged prior threats to Plaintiff, to which he responded that he did not, (*id.* at Lebron 410); whether Bader filed the ticket with retaliatory intent, to which he responded that he did not, (*id.*); whether Bader saw Plaintiff hit any COs during the incident, to which Bader responded that he just saw him face Williams and "put his hands up," (*id.* at Lebron 415); whether Bader saw any injuries to Plaintiff's face, to which Bader responded that he did not recall observing Plaintiff's face during the incident, (*id.* at Lebron 418–19); and how Plaintiff

could be charged with "interference," to which Bader responded that the entire incident "interfer[ed] with the J school run," (Defs.' Suppl. 56.1 ¶ 20; Hr'g Tr. at Lebron 425).

Levine refused to ask some of Plaintiff's suggested questions, including whether it would "make sense" for Plaintiff to throw a weapon in plain view of Bader and then "square off with one of the CO's [sic] present," which Levine declined to ask Bader because it was not a "proper question for [Bader]," (Hr'g Tr. at Lebron 409); whether it would be "logical for a prisoner" to carry a weapon while going to a legal research class, which Levine declined to ask because it was seeking Bader's "opinion," not a fact, (*id*. at Lebron 414); why, if Plaintiff "had the balls to square off" with Williams to begin with, would Plaintiff not try to use the weapon he supposedly had with him at the time for the fight itself, which Levine declined to ask because Bader could not be called upon to "answer what's inside [Plaintiff's mind]," (*id*. at Lebron 419); and what level of force could be used to restrain a prisoner who was "struggling and thrashing and combative," which Levine declined to ask because it was not "relevant to the hearing," (*id*. at Lebron 420).

### d.  Stevens' Testimony

On February 3, 2014, Plaintiff called Stevens as a witness.  (Defs.' Suppl. 56.1 ¶ 21 (citing Levine Suppl. Decl. ¶ 31; Hr'g Tr. at Lebron 443–74).)  Levine initially asked Stevens a number of questions, including, in relevant part: whether Stevens saw anything related to the first incident in the F and G corridor, to which Stevens responded that he did not because he was "escorting the J School run," (Defs.' Suppl. 56.1 ¶ 21; Hr'g Tr. at Lebron 443); whether Plaintiff was compliant by the time Stevens arrived on the scene, to which he responded that he was not and he was "putting feet forward, trying to push" so that he could not be pressed against the wall, (Hr'g Tr. at Lebron 445–46); and whether anything of note happened while Stevens was

escorting Plaintiff to SHU, to which he responded that Plaintiff "kept screaming, saying he was going to kill everybody," and "started spitting at people," (*id*. at Lebron 447).

Plaintiff was then given the opportunity to ask Stevens questions through Levine, which included, in relevant part: whether Stevens specifically saw Plaintiff in the line up at the F and G corridor prior to the incident, to which Stevens responded that he did not specifically notice Plaintiff, (*id*. at Lebron 450); whether Stevens noticed any of the injuries to Plaintiff's face, to which he responded that he remembered seeing some bruising but did not note exactly where on his face the injuries were present, (*id*. at Lebron 455–56); whether Stevens saw Plaintiff carrying a package of legal materials in one hand and his ID wallet in the other, to which he responded that he did not see Plaintiff prior to the pat frisk at all, (*id*. at Lebron 460–61); and whether Stevens knew that Plaintiff had filed a grievance about Mrzyglod's alleged threats to Plaintiff, to which Stevens responded that he did not, (*id*. at Lebron 463).

Levine refused to ask some of Plaintiff's questions, including: why Plaintiff would threaten Stevens if he was not one of the COs initially speaking to Plaintiff on December 26, 2013, which Levine declined to ask because Stevens could not be asked to "understand [Plaintiff's] state of mind," (*id*. at Lebron 453–54); how many use of force reports Stevens had been involved in between September 2013 to January 2014, which Levine declined to ask because it was not relevant to the proceedings, (*id*. at Lebron 457); why Plaintiff would wait until he had reached SHU to kick Stevens, which Levine declined to ask because it was improperly asking Stevens to "go into [Plaintiff's] mind," (*id*. at Lebron 461–62); and why an inmate would "logically possess a weapon" and throw it away before turning to face Williams, which Levine declined to ask because Stevens could not be expected to know what was in Plaintiff's mind, (*id*. at Lebron 464).

Plaintiff did not seek to ask Stevens how Plaintiff smuggled the weapon that the defendants recovered, whether Stevens saw where Plaintiff pulled the weapon form, and whether Stevens was able to explain how Plaintiff was able to smuggle any weapon or fight with any of the officers if he was holding his ID card and legal paperwork at the same time. (Defs.' Suppl. 56.1 ¶ 22 (citing Levine Suppl. Decl. ¶ 32).)

e. Williams' Testimony

On February 10, 2014, Plaintiff called Williams as a witness. (Defs' Suppl. 56.1 ¶ 23 (citing Levine Suppl. Decl. ¶ 33; Hr'g Tr. at Lebron 547–76).) Levine initially asked Williams a number of questions, including: what Williams remembered of the first incident in F and G corridor, to which Williams responded that he remembered pulling Plaintiff out for a random pat frisk, saw Plaintiff throw something towards the garbage can, and then saw Plaintiff turn around and face him with his "hands closed in an aggressive manner" before Bader tackled Plaintiff from behind, (Defs.' Suppl. 56.1 ¶ 23; Hr'g Tr. at Lebron 547–48); whether Williams remembered Plaintiff saying anything during the confrontation, to which Williams responded that he remembered Plaintiff making a series of threats, (Hr'g Tr. at Lebron 549); what Plaintiff did with his ID after showing it to Williams, to which Williams responded that he put the ID back in his coat or pants pocket, (Defs.' Suppl. 56.1 ¶ 25; Hr'g Tr. at Lebron 551); and whether Plaintiff used the same hand that had been holding his ID to throw the weapon away, to which Williams responded that he used the opposite hand to throw the weapon, (Defs.' Suppl. 56.1 ¶ 25; Hr'g Tr. at Lebron 551–52).

Plaintiff was then given the opportunity to ask Williams a number of questions, including: whether Williams remembered seeing Plaintiff hold his ID and legal paperwork in his hand prior to the first incident, to which he responded that he remembered Plaintiff showed him

his ID but did not remember seeing any legal paperwork, (Defs.' Suppl. 56.1 ¶ 24; Hr'g Tr. at Lebron 550–51. 560); whether, normally, Williams asks inmates to take items out of their pockets before sitting in the "boss chair," to which Williams responded that he typically asks inmates to first sit in the chair, and then, if it "beeps," he asks them whether they have any metal objects in their pockets, (Hr'g Tr. at Lebron 553); whether Williams recalled where Plaintiff took the weapon out from, to which Williams responded that he did not know where Plaintiff had kept the weapon, (Defs.' Suppl. 56.1 ¶ 26; Hr'g Tr. at Lebron 557); whether Williams could describe the weapon, to which Williams responded that it was a "two inch razor blade like weapon with a . . . masking tape handle and . . . cardboard sheet that was wrapped in. . . masking tape," (Hr'g Tr. at Lebron 559); whether Plaintiff's ID, papers, hat, or scarf were recovered during or after the incident, to which Williams responded that he did not recall, (Defs. Suppl. 56.1 ¶ 28; Hr'g Tr. at Lebron 561–62); whether Williams could recall how many other members of DOCCS staff were present at the time of the first incident, to which Williams responded that he could not recall, (Hr'g Tr. at Lebron 566); and whether Williams is part of a group known as the "beat-up squad," to which Williams responded he was not and he did not know of the existence of such a group, (id. at Lebron 569). During Plaintiff's questioning, he pointed out an alleged inconsistency in William's MBR, arguing that Williams was lying in the report, and Levine stated that he would "consider that possibility." (Id. at Lebron 576.)

Levine declined to ask Williams how many use of force reports he had been involved in from October 2013 to January 2014, as well as whether it would make "common sense" for

Plaintiff to "throw a weapon away right before [he] squared off" with Williams.  (*Id.* at Lebron 554, 572.)[6]

### f.  Salters' Testimony

On March 3, 2014, Plaintiff called Salters as a witness.  (Defs.' Suppl. 56.1 ¶ 30 (citing Levine Suppl. Decl. ¶ 40; Hr'g Tr. at Lebron 634–62).)  Levine asked a number of questions, including: what Salters remembered of the first use of force incident, to which Salters responded that he only observed Plaintiff being called over for a random pat frisk and did not recall seeing an ID or legal paperwork in Plaintiff's hands, (Defs.' Suppl. 56.1 ¶ 30; Hr'g Tr. at Lebron 636–37); and whether Salters saw any contraband recovered after the incident, to which Salters responded that he had remained in the officer's bubble, where he was assigned and did not see any contraband, (Defs.' Suppl. 56.1 ¶ 30; Hr'g Tr. at Lebron 636–37).

Plaintiff was then offered the opportunity to ask Salters questions, and he asked, through Levine, in relevant part: whether another CO was with Salters at his assigned post the night of the incident, to which Salters responded there was, but he did not recall his name, (Hr'g Tr. at Lebron 644); whether Mrzyglod was in the area, to which Salters responded that he was, since he was the area Sergeant, (*id.* at Lebron 644–45); whether he saw Plaintiff put anything in his hands when he was pulled out of line for a pat frisk, to which Salters responded that he did not recall seeing anything in Plaintiff's hands, (*id.* at Lebron 646–47); whether Salters saw Plaintiff throw any object on to the floor at the F and G Corridor during the incident, to which Salters responded that he did not, (Defs.' Suppl. 56.1 ¶ 30; Hr'g Tr. at Lebron 647); whether a distress call was

---

[6] The transcript appears to state that Plaintiff asked Williams how many use of force incidents *Plaintiff* (noted as "I" in the transcript) had been involved in over the relevant period, but, given Plaintiff's repeated use of this question with other CO witnesses, the Court construes that to be a typographical error.  (*See* Hr'g Tr. at Lebron 554.)

made during the incident, to which Salters responded that he did not recall, (Hr'g Tr. at Lebron 652–53); whether Salters heard Mrzyglod threaten Plaintiff at all, to which he responded that he did not, (*id.* at Lebron 658–59); whether Salters saw any injuries to Plaintiff's face when he was leaving the F and G corridor in restraints, to which Salters responded that he did not, (*id.* at Lebron 659); and whether Salters saw a rectangular object with white tape recovered that night, to which Salters responded that he did not, (*id.* at Lebron 661).

Levine declined to ask Plaintiff's question about the "procedure and policy" regarding how much force a CO is allowed to use on an inmate alleged to possess a weapon because, according to Levine, it had "been gone over" and because any use of excessive force as not the issue in this hearing. (*Id.* at Lebron 650–51.) Levine also declined to ask Salters how many use of force incidents he had been involved in as not relevant. (*Id.* at Lebron 660.)

Plaintiff did not seek to ask, and Levine did not ask Salters how Plaintiff smuggled the weapon, whether Salters saw from where Plaintiff pulled the weapon, and whether Salters was able to explain how Plaintiff could have smuggled the weapon if he was holding his ID card and legal papers simultaneously. (Defs.' Suppl. 56.1 ¶ 31.)

g. Testimony Regarding the Chain of Custody

On March 3, 2014, Plaintiff called Captain Melville to discuss the chain of custody with respect to the weapon that Plaintiff was charged with possessing in connection to the first use of force in the F and G Corridor. (Defs.' Suppl. 56.1 ¶ 32 (citing Levine Suppl. Decl. ¶ 42; Hr'g Tr. at Lebron 690–709).) At one point, Plaintiff asked Melville how many captains were assigned to the Green Haven facility, to which Levine responded that they had "already gone through that." (Defs. Suppl. 56.1 ¶ 32; Hr'g Tr. at Lebron 694.) However, the transcript goes on to show that Plaintiff later stated, following a short colloquy with Levine, that he "understand[s], for the

16

record . . . there's [sic] two Captains." (Hr'g Tr. at Lebron 695.) Following that, Levine asked Melville where the other captain was on the day of the incident, December 26, 2013, to which Melville responded that he was "not positive" but believed that "he was off that day." (*Id*. at Lebron 695–96.)

Earlier in the hearing, after Gunsett's testimony, Levine and Plaintiff engaged in a colloquy regarding the chain of custody of the weapon. (Defs.' Suppl. 56.1 ¶ 33 (citing Levine Suppl. Decl. ¶ 43; Hr'g Tr. at Lebron 331–81).) Levine told Plaintiff that Melville was the individual in charge of moving the weapon from the contraband lockbox to the contraband locker. (Defs.' Suppl. 56.1 ¶ 33; Hr'g Tr. at Lebron 339.) The chain of custody form appears to show Melville's signature as the last one of the left side of the page in connection to an item described as a "blade type weapon," but the form is difficult to read. (Ex. Chain of Custody Form ("Chain of Custody Form") (Dkt. No. 121-9).)

A non-party CO, Tokarz, testified on March 3, 2014, to further explain the chain of custody of the weapon. (Defs.' Suppl. 56.1 ¶ 34 (citing Levine Suppl. Decl. ¶ 45; Hr'g Tr. at Lebron 663–90).) Tokarz testified that generally, a captain is in charge of removing contraband from the lockbox to the "serious contraband room" and that the captain typically brings in another employee to witness the removal. (Hr'g Tr. at Lebron 664.) On December 31, 2015, Tokarz witnessed Melville remove the item referenced in the Chain of Custody Form, but did not recall seeing the particular item through the plastic. (*Id*. at Lebron 664–65.) Levine also engaged in a colloquy with Tokarz about generally having two captains at the facility. (*Id*. at Lebron 678–79.) Although Tokarz did not know with certainty, he presumed that a captain other than Melville could also move contraband as Melville did with the blade that allegedly belonged to Plaintiff. (*Id*. at Lebron 678–79.)

### 3.  Plaintiff's Grievance Regarding Mrzyglod

Plaintiff states that two weeks prior to the use of force incidents, he sent Lee a grievance expressing fear that he would be assaulted because of the threat Mrzyglod made against him. (FAC ¶ 53.)  Plaintiff states that Lee ignored this grievance, failed to perform his duties, failed to protect Plaintiff, and failed to follow the "rules and procedures of this situation."  (SAC 2.) Plaintiff states that Lee failed to investigate the assault on him involving a weapon that the "officers planted at this scene of events."  (*Id.*)  Plaintiff further states that on the day of the use of force incident, the COs did not make any distress calls or indicate that any staff was experiencing a "threat or serious problem," that this was unusual, and that Lee should have found this suspicious and further investigated.  (*Id.*)  Plaintiff further states that Lee failed to conduct background investigations of the COs and that such an investigation would have revealed they were involved in many incidents of physical violence.  (*Id.* at 3, 5.)

On January 2, 2014, the Green Haven grievance office received a complaint form from Plaintiff, dated December 21, 2013, that would be designated Grievance No. GH-76369-14. (Defs.' Suppl. 56.1 ¶ 35 (citing Decl. of Thomas H. Mauro ("Mauro Decl.") (Dkt. No. 121-12); Mauro Decl. Ex. Grievance at Lebron 990–92 ("Grievance") (Dkt. No. 121-14).)  Thomas H. Mauro ("Mauro"), a non-party, is the Inmate Grievance Program ("IGP") Supervisor at Green Haven.  (Mauro Decl. ¶ 2.)  His position entails receiving and processing grievances, processing appeals, and handling all correspondence received by the IGP.  (*Id.*)  According to Mauro, it is clear that the IGP received the Grievance on January 2, 2014 because he sent Plaintiff an Acknowledgement of Receipt Form on that day.  (Mauro Decl. Ex. Grievance at Lebron 989 ("Grievance Receipt Form") (Dkt. No. 121-14).)  Mauro is unable to explain the gap between December 21, 2013 and January 2, 2014, noting that it may have taken longer for the grievance

to reach the office because it was "around the holidays" and because of "staff days off."  (Mauro Decl. ¶ 15.)  Mauro also posits that it may have been possible that Plaintiff actually submitted the Grievance at a later date than December 21, 2013, the date he wrote on the Grievance.  (*Id.*)  According to Mauro, however, regardless of the reason for the delay, "Lee played no part in delivering grievances from inmates to the grievance office or in processing those grievances once they arrived."  (*Id.*)

On January 2, 2014, Mauro reviewed the Grievance and determined that it should be designated Code 49, which involves allegations of harassment or misconduct by staff.  (Defs.' Suppl. 56.1 ¶ 37; Mauro Decl. ¶ 17; Mauro Decl. Ex. Grievance at Lebron 988 ("Code 49 Designation") (Dkt. No. 121-14).)  The Code 49 Designation contains a space for the Superintendent to initial, approving of Mauro's initial designation of the Grievance as a Code 49; the Superintendent initials on the form here appear to be dated January 2, 2014.  (Code 49 Designation.)  Mauro states that he received Lee's response on January 6, 2014, which is noted at the top of the Grievance, where Mauro also wrote and circled the number "49" to indicate that it should be designated a Code 49 grievance.  (Defs.' Suppl. 56.1 ¶ 40; Grievance.)

Defendants explain that the Grievance was forwarded to the Inmate Grievance Review Committee ("IGRC") clerk, who assigned it an official number, GH-76369-14, and filed it on January 7, 2014.  (Defs.' Suppl. 56.1 ¶ 41; Mauro Decl. ¶ 19.)  This filing date explains the "JAN 7 2014" stamp that appears on each page of the Grievance, the Grievance Receipt Form, and Code 49 Designation.  (Mauro Decl. ¶ 19; Grievance; Grievance Receipt Form; Code 49 Designation.)

Defendants claim that an investigation into Plaintiff's Grievance was conducted by non-party Lieutenant Murphy ("Murphy"), who questioned "various staff members" and obtained

written responses from those individuals. (Mauro Decl. ¶ 20; Mauro Decl. Ex. Grievance at Lebron 993–1001 ("Grievance Investigation Docs.") (Dkt. No. 121-14).) Defendants posit that it is "not unusual" that the investigation took several months to complete, as Green Haven personnel deal with "approximately 2000 grievances per year." (Mauro Decl. ¶ 20.) Following Murphy's investigation, on August 27, 2014, Lee issued a decision denying the Grievance on the grounds that Plaintiff's allegations could not be substantiated. (*Id*. ¶ 21; Mauro Decl. Ex. Grievance at Lebron 1002 ("Grievance Decision") (Dkt. No. 121-14).) Plaintiff completed the appeal statement portion at the bottom of the Grievance Decision. (Mauro Decl. ¶ 22; Grievance Decision.) The appeal went to the Central Office Review Committee ("CORC"), which requested more information, (Mauro Decl. ¶ 23), and ultimately upheld Lee's Decision, (*id*. ¶ 24; Mauro Decl. Ex. Grievance at Lebron 987 ("CORC Decision") (Dkt. No. 121-14).)

B.  Procedural Background

The procedural background of this Action is addressed extensively in the First Opinion. (First Op. 21–23.)

Following the issuance of the First Opinion, which identified deficiencies with Defendants' submissions regarding the hearing transcript and handling of Plaintiff's Grievance, *id*. at 38–40; 41–42), Defendants requested leave to file a supplementary summary judgment motion, (Dkt. No. 116.) The Court granted the request and ordered that Defendants file any such motion by August 30, 2019, that Plaintiff submit any opposition by September 30, 3019, and that Defendants submit any reply by October 15, 2019. (Dkt. No. 117.) The Court noted that no extensions would be granted. (*Id*.) Defendants filed the instant Supplemental Motion on August 30, 2019. (*See* Not. of Suppl. Mot.) Plaintiff submitted no opposition, and Defendants

submitted no reply.  The Court deemed the Supplemental Motion fully submitted on October 16, 2019.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that

there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation marks omitted). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (quotation marks omitted). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at

*7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment."  *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment."  *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

Defendants argue that, as reflected in the hearing transcript, Plaintiff's due process rights were not violated because Plaintiff was able to sufficiently examine witnesses, (Defs.' Suppl. Mem. 18), and that, as reflected in the additional Grievance-related documents, Lee was not personally involved in any constitutional violation, (*id*. at 22).  The Court addresses each argument in turn.

### B.  Procedural Due Process Claim

In relevant part, Plaintiff alleges that Levine violated his due process rights during his disciplinary hearing by failing to ask witnesses a number of questions pertaining to where and when they saw Plaintiff possessing a weapon prior to the first altercation that occurred on

December 26, 2013.  (FAC ¶¶ 46–52; SAC at 6–7.)  Following the hearing at issue, Levine

ultimately sentenced Plaintiff to fourteen months in the SHU and fourteen months of loss of

packages, commissary, phone usage, and good time.  (First Levine Decl. ¶ 26; First Levine Decl.

Ex. C ("Hearing Form") at Lebron 123 (Dkt. No. 101-12).)[7]

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty

interest and (2) that the defendants deprived him of that interest as a result of insufficient

process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citation, alteration, and quotation

marks omitted).  The Supreme Court has held that inmates retain due process rights in prison

disciplinary proceedings.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the

procedural protections that inmates are to receive when subject to significant disciplinary

punishment).  However, the Supreme Court has clarified that "[p]rison discipline implicates a

liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life.'"  *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515

U.S. 472, 484 (1995)).  The Second Circuit has explained that "[t]he length of disciplinary

confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship

test."  *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (citation and quotation marks

omitted).  The duration of disciplinary confinement, however, is "not the only relevant factor,"

and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU

confinement automatically fails to implicate due process rights."  *Palmer v. Richards*, 364 F.3d

---

[7] In the First Opinion, the Court granted summary judgment to Defendants on the question of whether Levine's denial of Plaintiff's request to call certain witnesses constituted a violation of procedural due process.  (First Op. 37.)  The Court also concluded that Plaintiff's conclusory statements that (1) the CO witnesses were lying at his hearing or (2) that Levine knew that they were lying did not create genuine disputes of fact and granted summary judgment to Defendants on those claims as well.  (*Id*. at 40 n.11.)

60, 64 (2d Cir. 2004). As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). "The court may resolve the issue of atypicality as a matter of law only when the conditions are uncontested." *Houston v. Cotter*, 7 F. Supp. 3d 283, 297 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 65). Indeed, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66; *see also Houston*, 7 F. Supp. 3d at 298 (same).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "[P]rison discipline decisions affecting an inmate's liberty interest cannot be 'imposed arbitrarily' but must be 'supported by some evidence in the record.'" *Sira v. Morton*, 380 F.3d 57, 76 (2d Cir. 2004) (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). "Judicial review of this 'some evidence' standard is narrowly focused": "it 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant

question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id*. (quoting *Hill*, 472 U.S. at 455–56). Finally, "the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (italics omitted) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

As the Court noted previously, it is undisputed that Plaintiff has satisfied the first element of his due process claim, as his 14-month confinement in SHU exceeds the 101-day threshold set forth by the Second Circuit. *See Palmer*, 364 F.3d at 65–66. The issue before the Court is therefore limited to whether Levine's questioning of the correction officer witnesses provided Plaintiff with due process.

The Court's main concern in the First Opinion was that Defendants "did not submit the hearing testimony" of several CO witnesses involved in the first use of force incident. (First Op. 38.) This rendered the Court unable to determine what the witnesses said about Plaintiff's possession of a weapon, what happened to the weapon, and whether Levine's questioning of those witnesses comported with due process. Defendants have now submitted the transcript of the disciplinary hearing, and the Court concludes that Defendants have shown that there is no triable issue of fact as to Levine's questioning of the witnesses and general comportment with procedural due process.

"While inmates have the right to question witnesses at their disciplinary hearings, that right is not unlimited, and its contours are under the discretion of prison officials." *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002); *see also Lewis v. Murphy*, No. 12-CV-268,

2014 WL 3729362, at *11 (N.D.N.Y. June 24, 2014) (upholding the authority of a hearing officer to "administer the questioning in a manner he saw fit").  Even where a hearing officer does "not permit [the inmate] to ask every question," when a "hearing transcript shows that" the witnesses were questioned "extensively," an inmate was afforded a constitutionally sufficient "opportunity to call witnesses." *Murray v. Arquitt*, No. 10-CV-1440, 2014 WL 4676569, at *16 (N.D.N.Y. Sept. 18, 2014).  During an inmate's portion of the questioning, the hearing officer "retain[s] the authority and discretion to administer the questioning in a manner [the hearing officer] deem[s] appropriate." *Perez v. Keysor*, No. 10-CV-0518, 2013 WL 5493932, at *22 (N.D.N.Y. Sept. 23, 2013).

Here, no reasonable jury could conclude that Levine failed to give Plaintiff due process during Plaintiff's disciplinary hearing.  As to multiple witnesses, Plaintiff did not even seek to ask questions about from where the weapon could have originated or how Plaintiff could have smuggled it on his body.  (*See* Defs.' Suppl. 56.1 ¶¶ 10 (Mrzyglod); 13 (Gunsett); 22 (Stevens); 31 (Salters).)  To the extent that Levine declined to ask some of Plaintiff's questions, Levine articulated justifications for those decisions, which all fell squarely within his discretion as the hearing officer to maintain a reasonable scope of the hearing. *See Reed v. Wolczyk*, No. 10-CV-609, 2012 WL 5520714, at *10 (N.D.N.Y. Oct. 23, 2012) ("While [the hearing officer] did not permit [the inmate] to ask every question, a review of the hearing transcript shows that [the hearing officer] did permit [the inmate] to question the witnesses rather extensively.  Moreover, when [the hearing officer] denied [the inmate's] questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.").  For example, Plaintiff attempted to ask a number of witnesses how many use of force incidents they had participated in within a certain amount of time, and Levine declined to ask the

questions because, in Levine's determination, they were irrelevant to the ultimate question of Plaintiff's alleged misbehavior. (*See* Hr'g Tr. at Lebron 303 (Mrzyglod); Lebron 324 (Gunsett); Lebron 457 (Stevens); Lebron 554 (Williams) Lebron 660 (Salters).) Levine also declined to permit Plaintiff to question witnesses about how, logistically, Plaintiff could have smuggled in a weapon or why, logically, Plaintiff would have thrown away the weapon before turning to face Williams in an aggressive manner, stating that the witnesses could not be called upon to "answer what's inside [Plaintiff's] mind." (Hr'g Tr. at Lebron 464 (Stevens); *see also id*. at Lebron 414 (Bader); Lebron 572 (Williams).)[8]

However, Levine, either of his own accord or by prompting from Plaintiff, *did* engage in "extensive[]" questioning of the CO witnesses and the circumstances surrounding Plaintiff's supposed possession of a weapon during the first altercation on December 26, 2013. *Reed*, 2012 WL 5520714, at *10. For example, the hearing elicited testimony that: Mrzyglod had not actually seen the beginning of the altercation when Plaintiff threw the weapon on the ground, (Defs.' Suppl. 56.1 ¶ 8; Hr'g Tr. at Lebron 293–94); Mrzyglod did not plant the weapon on Plaintiff to cover up his alleged assault on Plaintiff, (Defs.' Suppl. 56.1 ¶ 9; Hr'g Tr. at Lebron 312); Mrzyglod saw the weapon later by the garbage cans, (Defs.' Suppl. 56.1 ¶ 8; Hr'g Tr. at Lebron 293); Bader saw Plaintiff ditch "some little object over by the garbage," which he later recovered and put in the contraband lockbox, (Defs.' Suppl. 56.1 ¶ 14; Hr'g Tr. at Lebron 398–400); and Williams saw Plaintiff throw a small object toward the garbage can before Plaintiff turned around to face Williams "in an aggressive manner," (Defs.' Suppl. 56.1 ¶ 23; Hr'g Tr. at

---

[8] During Williams' testimony, Levine noted that this line of questioning was "argumentative," but that he would "take it as argument." (Hr'g Tr. at Lebron 572.) Thus, the record indicates that although Levine did not allow Plaintiff to ask witnesses these questions, he acknowledged the arguments that Plaintiff was trying to make by asking them.

Lebron 547–48).  As to Plaintiff allegedly holding his ID wallet and legal folder in his hands,

Bader testified that he did not recall seeing Plaintiff holding either or both of those items, (*see*

Defs.' Suppl. 56.1 ¶ 15), Stevens testified that he did not see Plaintiff prior to the pat frisk at all

and was not aware of whether Plaintiff possessed those items, (Hr'g Tr. at Lebron 460–61), and

Williams testified that he recalled Plaintiff showing his ID but did not recall seeing any legal

paperwork, (Defs.' Suppl. 56.1 ¶ 24; Hr'g Tr. at Lebron 550–51).  Williams testified that

Plaintiff put his ID back in his pocket with one hand and used the opposite hand to throw the

weapon to the floor.  (Defs' Suppl. 56.1 ¶ 25; Hr'g Tr. at Lebron 551–52.)  Levine therefore

elicited a significant amount of testimony pertaining to the circumstances surrounding Plaintiff's

possession of a weapon and asked enough of Plaintiff's pertinent questions to comport with due

process.  *See Rodriguez v. Patchen*, No. 13-CV-1086, 2018 WL 2122877, at * 8 (W.D.N.Y. Mar.

1, 2018) (granting summary judgment in favor of defendants where the record make clear that,

inter alia, the plaintiff was generally able to "ask questions of witnesses, and to place objections

on the record"), *adopted by* 2018 WL 2119768 (W.D.N.Y. May 8, 2018); *Lewis*, 2014 WL

3729362, at *11 (holding that due process was afforded to the plaintiff where, although the

hearing officer "did not permit [the inmate] to ask every question," the hearing officer "offered

reasoning for the denial of certain questions" and the witnesses were nevertheless questioned

"rather extensively"); *Perez*, 2013 WL 5493932, at *22 (holding that inmate received due

process even though "not every question was permitted to be asked").[9]

---

[9] Although perhaps imperfect in its persuasiveness, the amount of evidence elicited during the hearing also meets the low bar of requiring only "some evidence to support" a finding of guilty following an inmate's disciplinary hearing.  *Hill*, 472 U.S. at 457.  "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of the witnesses, or weighing of the evidence.  Instead, [as noted,] the relevant question is whether there is any evidence in the record that could support the

In its First Opinion, the Court also expressed some concern about whether Levine

established the chain of custody of the weapon because Defendants "did not submit the portion

of the hearing transcript in which Plaintiff's potentially relevant question about the Captains and

their role in transferring contraband was asked or answered." (First Op. 37.) Defendants have

now submitted that portion of the transcript. The remainder of the transcript shows that Plaintiff,

based on prior conversations with Levine, understood there to be two captains at the facility.

(Hr'g Tr. at Lebron 695.) Moreover, Melville, the captain on duty the day of the incident,

testified that he believed that the other captain was "off that day." (*Id*. at Lebron 695–96.)

Tokarz, a non-party, testified as to the chain of custody of the weapon, stating that he

accompanied Melville while Melville removed the weapon from the lockbox to the "serious

contraband room." (*Id*. at Lebron 664.) Now with the ability to examine the full record, the

Court identifies no triable dispute of fact regarding procedural due process or other constitutional

violations with respect to this issue, either.

Accordingly, the Court grants summary judgment as to Levine regarding Plaintiff's

procedural due process claim.

---

conclusion reached by the [hearing officer]." *Fulton v. Baltazar*, No. 16-CV-6085, 2018 WL
389097, at *4 (S.D.N.Y. Jan. 11, 2018) (quoting *Hill*, 472 U.S. at 455–56).

Here, Bader testified that he saw Plaintiff throw the weapon on the floor near the garbage
cans and that, later, Bader himself recovered the weapon and placed it in the contraband lockbox,
(Defs.' Suppl. 56.1 ¶ 14), Williams testified that he witnessed Plaintiff throw something toward
the garbage cans before Plaintiff turned around to face him, (*id*. ¶ 23), and Mrzyglod testified
that, although he did not see Plaintiff when he threw an item, he later saw a small blade-like item
near the garbage cans, (*id*. ¶ 8). The consistent testimony of multiple CO witnesses, with no
further indication that such testimony was "blatantly implausible," meets the low bar of
answering the question of "whether there was reliable evidence of the inmate's guilt." *Luna*, 356
F.3d at 488 (citations and quotation marks omitted).

### C.  Personal Involvement of Lee

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal[;] failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and quotation marks omitted).  Accordingly, for Plaintiff's due process claim to go forward against Lee, Lee must fall into one of the five categories identified above.  *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Plaintiff alleges that Lee was deliberately indifferent to his safety by failing to protect him from being assaulted on December 26, 2013, after Plaintiff filed a grievance two weeks before the use of force incidents.  (FAC ¶ 53.)  Defendants argue that Plaintiff has failed to demonstrate that Lee was personally involved in any wrongdoing because Plaintiff's Grievance regarding the alleged threat from Mrzyglod was not received by the IGP supervisor, and Lee did not learn of the Grievance, until January 2, 2014, nearly a week after the December 26, 2013 use of force incidents.  (Defs.' Suppl. Mem. 22–23.)

Lee states that he received a copy of the Grievance on January 2, 2014.  (Defs.' Suppl. 56.1 ¶ 38 (citing Lee Suppl. Decl. ¶ 6).)  However, Plaintiff handwrote the date December 21,

2013 on the Grievance. (Defs.' Suppl. 56.1 ¶ 35; Grievance.) A number of unexplained markings on the Grievance and accompanying papers with conflicting dates led the Court to conclude, in its First Opinion, that "at this stage," it could not "decide to credit Lee's version of events that Plaintiff first filed [the Grievance] on January 2, 2014." (First Op. 41.)

Defendants' supplemental submissions on this issue now make clear that Plaintiff has not raised a genuine dispute of fact as to Lee's personal involvement in any failure to protect claim. In connection with this Supplemental Motion, Mauro, the grievance supervisor at Green Haven, has submitted a declaration explaining that the date on the Grievance Receipt Form, January 2, 2014, indicates that the IGP received and processed the Grievance on that day. (Mauro Decl. ¶ 15; Grievance Receipt Form.) Further, Mauro states that Lee first became involved with the Grievance when he confirmed Mauro's preliminary Code 49 Designation, which is also dated January 2, 2014. (Mauro Decl. ¶ 17; Code 49 Designation.) Although Mauro provides no concrete explanation for the discrepancy between December 21, 2013 (the date Plaintiff noted on the Grievance) and January 2, 2014 (when the Grievance Receipt Form was issued) Mauro also specifies that "Lee played no part in delivering grievances form inmates to the grievance office or in processing those grievances once they arrived." (Mauro Decl. ¶ 15.) The documentation submitted by Defendants corroborates Lee's statement that he did not receive the Grievance until January 2, 2014, when he completed and confirmed the Code 49 Designation. (Lee Suppl. Decl. ¶ 6.) Lee is also not otherwise alleged to have participated in any constitutional violation.

Accordingly, the Court grants summary judgment as to Lee for lack of personal involvement in Plaintiff's failure to protect claim. *See Brown v. Chappius*, No. 13-CV-105, 2016 WL 11594225, at *6 (W.D.N.Y. Aug. 11, 2016) (holding that stamps indicating that a grievance complaining of threats was received and processed by the superintendent's office after

the assault fails to establish the personal involvement of the superintendent), *adopted by* 2019

WL 2177023 (W.D.N.Y. May 20, 2019); *Wright v. Goord*, No. 04-CV-6003, 2005 WL 3466011,

at *1–2 (W.D.N.Y. Dec. 19, 2005) (granting summary judgment to the defendants for a failure to

protect claim and crediting the defendants' declarations regarding their lack of personal

involvement in handling plaintiff's grievance); *Liner v. Goord*, 310 F. Supp. 2d 550, 555

(W.D.N.Y. 2004) (granting summary judgment for the defendant where the record showed only

that the "letters were received in his office [and] reviewed by his staff" and "forwarded to the

appropriate official for investigation and response").[10]

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' Supplemental Motion for

Summary Judgment in favor of Defendants Levine and Lee, who should be terminated from the

case. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No.

118.) The Court will hold a Status Conference on December 10, 2019 at 10:00 a.m.

SO ORDERED.

Dated:  November 13, 2019
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[10] Because the Court grants Defendants' Supplemental Motion on the merits and
concludes that no constitutional violation has occurred, it is not necessary to address Defendants'
arguments as to the application of qualified immunity to Lee or Levine. (*See* Defs.' Suppl. Mem.
24.)

34